EARL JACKSON v. CATHCART & MAXFIELD, INC. AND OTHERS.
BERNADETTE M. PARKER AND ANOTHER, RELATORS.[1]

January 7, 1938.

No. 31,187.

[1]Reported in 277 N. W. 22.

*Kyle & Kyle,* for relators.

*Bradford, Cummins & Cummins,* for respondent-employe.

JULIUS J. OLSON, JUSTICE.

*Certiorari* brings for review an order of the industrial commission granting employe-respondent compensation. We shall refer to him as claimant.

The facts are not in substantial dispute and may be summarized in this fashion: Mary A. Maloy, a long-time resident of Ramsey county, died in June, 1924, testate. To each of the relators, her daughters, was given an undivided one-fourth interest in two apartment buildings in St. Paul. They later acquired an additional three-eighths interest—through the death of a brother and by purchase from another sister—so that at all times here material they owned as tenants in common an undivided seven-eighths interest therein. As trustees under a trust created under the terms of their mother's will they have charge of the remaining one-eighth interest for the use and benefit of three minor grandchildren of testatrix. They have authority thereunder "to continue any investment in the form into which it may come into their hands" with power to sell, convey, and reinvest. The property so devised remains intact and is devoted to the same uses as had theretofore prevailed while owned by the mother. The two buildings are situated upon the same tract and "were operated as a unit." One consists of six regular and two basement apartments; the other of six regular and a janitor's apartment in the basement. Relators were not insured for workmen's compensation liability. The properties are encumbered.

Relators are housewives living with and being supported by their husbands. They are not engaged in any business or profession unless the ownership of this property compels such conclusion. The net income therefrom is small, less than $50 per month to each. Neither has ever bought or sold any real estate (except for the interest purchased from the sister, Mrs. White, in 1932) ; nor has either owned any other real estate except that Mrs. Parker owns the family home in Minneapolis in which she and the other members of her family reside and have so resided over a period of years. Relator Mrs. Garrett has for 12 years or more resided and still continues to reside in one of the apartments. A sister, Helen White, and her minor children, the beneficiaries under the trust hereinbefore mentioned, occupy another such apartment.

The management of these buildings was left with Cathcart & Maxfield, Inc. It undertook, and has over a period of some eight years had and performed, the duty and responsibility of securing tenants, making leases, attending to repairs, and having general superintendence of the buildings. It collects rents, pays for repairs and other upkeep, issues monthly statements showing receipts and disbursements, and remits the balance to relators after deducting the agreed commission of five per cent of gross rental income.

In November, 1933, relators engaged one Carl Ritchie as janitor of these apartments at a monthly wage of $45, and in addition the free use of one of the basement apartments as his living quarters. His duties consisted of taking care of the heating, cleaning the halls, and burning and otherwise disposing of garbage, removing and replacing storm windows and screens. He was only a part-time employe of relators, as he was doing similar work for others. He had no authority from relators or either of them to employ anyone to assist him. As a matter of fact, it was distinctly understood between him and them that in the event he wanted any assistance in any of his work it was up to him to procure such and to pay for it out of his own pocket. Likewise, if he took a vacation, he himself had to hire and pay for the substitute.

In the early part of May, 1934, the janitor wanted someone to help him take off storm windows and put up screens in their places.

Entirely on his own motion and without consulting relators or either of them, he engaged claimant Jackson. The latter rendered the help for which he was so hired. He frankly testified that he dealt with Ritchie only and knew nothing about the ownership of the property. While there at work, so he claims, he ran a sliver into his hand, out of which later developed an infection which has, because of later developments, brought him much pain and suffering and undoubtedly has created a condition whereby his earning capacity has been seriously affected. It may be remarked that the janitor denied having any knowledge of claimant's injury having been sustained while so employed. He testified that claimant later informed him that he had gotten a sliver in his hand while working for Swift & Company in moving some barrels. This was a day or two after the job of taking off storm windows and placing the screens was finished. It is conceded on claimant's part that he did so work for Swift & Company and that his employment was that of taking away the intestines and other offal coming out of animals on the killing floor. These had not been treated or subjected to any disinfectant or germicide.

The referee found that claimant's employment was casual and not in the usual course of the trade, business, profession, or occupation of relators individually or as trustees, hence compensation was denied. On appeal a majority of the commission set aside that finding and in its place substituted a finding of its own to the effect that claimant was employed under a Minnesota contract of hire by relators individually and as trustees; that his hourly wage was 30 cents, weekly wage $13.20; and that the injury arose out of and in the course of his employment. One of the commissioners dissented, being of the view that relators were not engaged in any "business within the meaning of the workmen's compensation law," and that this case was controlled by Billmayer v. Sanford, 177 Minn. 465, 225 N. W. 426.

We shall refrain from further recitation of the facts now, but some others will be mentioned under the first subdivision of the opinion.

. Relators assign several errors, which, however, we think may be grouped under two subdivisions: (1) Whether the finding that claimant was an employe of relators is warranted by the evidence, and (2) whether if such employment be established it was in the usual course of any business of relators. It is unanimously conceded by the commission "that the services rendered by Jackson to the estate [meaning relators] was casual is obvious." Hence we may proceed directly to the consideration of the issues mentioned.

■ Claimant is not entitled to compensation under the workmen's compensation act unless he was an employe of relators. This is plain from the definition of employer as contained in 1 Mason Minn. St. 1927, § 4326: "The term 'employer' as used herein, shall mean every person * * * who employs another to perform a service for hire and to whom the 'employer' directly pays wages, * * *." The act covers only those who stand in the relation of employer and employe. State ex rel. Berquist v. District Court, 145 Minn. 127, 176 N. W. 165; Arterburn v. County of Redwood, 154 Minn. 338, 191 N. W. 924; O'Rourke v. Percy Vittum Co. 166 Minn. 251, 207 N. W. 636.

The majority opinion of the commission concedes:

"It was Ritchie's understanding that if he required any assistance for such work as putting on or taking off screen doors and windows it would be incumbent upon him to hire such help and pay for it out of his wages. When he took his vacation he hired a man to assume his duties and paid him out of his salary." But the majority were of the view that "the hiring of Jackson by Ritchie to work on the premises was done with the knowledge of Mrs. Garrett, and the fact that Jackson was to be paid for his services out of the monthly stipend of Ritchie does not compel a finding that the Maloy heirs were not the employers of Jackson. The facts of the case indicate that it was anticipated that Ritchie would need an assistant at times, whom he was privileged to engage, and his wages were made commensurate to cover such contingency."

As sustaining the legal conclusion that the relationship of employer and employe followed, the opinion cites and relies upon State ex rel.

Gaylord Farmers Co-op. Creamery Assn. v. District Court, 128 Minn. 486, 151 N. W. 182, and Janosek v. Farmers Co-op. Creamery Co. 182 Minn. 507, 234 N. W. 870.

It is well to consider the facts as disclosed by the record before discussing the cited cases.

It is true that Mrs. Garrett saw claimant while assisting the janitor in doing this work, but that does not establish the relationship of master and servant, even by inference, because the janitor was, under his contract of employment, required to furnish his own help, if such he deemed needed, at his own expense. Claimant thought he was working for the janitor. He dealt with and took his orders from no one else. The nearest approach to anything pointing in the direction of control or supervision by relators is found in claimant's testimony and that of Mrs. White, as follows (by claimant):

A. "If I remember correctly it was the second day, because she came up where we were working and we had the screen numbers mixed up, and she interfered with it, and that is why I asked who she was. She helped us straighten it out, and I asked him [the janitor], 'who is this lady?' and he said, 'I think she is one of the owners, but I am not sure.'

Q. "Do you recall what she told you to do?

A. "She told us to be more careful and told us how to read them."

There was an objection raised at this point by Mr. Kyle as attorney for the owners, but the witness was allowed to proceed as follows:

Q. "Mr. Jackson, will you tell us what she said.

A. "As near as I can remember she said, 'I suppose you men folks think us women folks don't know anything about this work, but this isn't the first year I have helped put on the screens. Pretty near every year I help the men put on the screens.' "

On cross-examination this was brought out:

Q. "You don't know if her name was White?

A. "It appears like it was, but I am not positive. She lived on

the second floor of the Dale street apartment on the front end, on the opposite side from Grand avenue. The reason I come to know that is she pointed out her windows to us in the alley."

Counsel for relators moved to strike the testimony of the witness as not binding upon them in that it was not shown that she (Mrs. White) was an owner or had any authority to speak for them. The referee said that he considered it "worthless at the present time," but thought it would be well to leave it in the case to see what the later developments might be. Later in the case Mrs. White was called as a witness for relators. She explains the incident in this fashion:

"He [claimant] was washing screens with a hose, and Carl [the janitor] would call out the numbers, and he [claimant] didn't know the Roman numerals, and he would hand up XIV, which would not fit, and four or five windows had to go up before they would get the [right] window, and I finally picked out the window for Mr. Jackson, because I couldn't stand to see his monkeying away like that."

It is well to remember in this connection that the record establishes that in September, 1932, Mrs. White had conveyed all of her interest in this property to relators. She had no interest therein except as a tenant of one of the apartments; and there is nothing to show that she had authority in any way to bind relators after this deal was made. True, her three minor children have an undivided one-eighth interest in the property under the terms of their grandmother's will, but that instrument authorized and empowered these relators as trustees to take and have possession of the trust estate, and "to continue any investment in the form into which it may come into their hands." Thus in them and them alone was vested the authority going with ownership. No authority, expressed or implied, had been granted to Mrs. White to speak for relators or in any way to bind them as their representative. What she said and did amounted to no more than what any other tenant might have said or done. Furthermore, how can it be said that what she did amounted to "supervision" or "control" of claimant in the

sense usually applied where the relationship of master and servant exists? At most it was but a friendly and helpful gesture that any bystander might appropriately offer.

The cases cited and relied upon by the commission majority do not sustain the theory upon which this case must rest. In the first cited case the second syllabus paragraph contains the meat of the issue and reads (128 Minn. 486):

"Where an employer pays to an employe having *general charge of the affairs of the employer's business a fixed sum of money each month, from which the employe is required to pay an assistant,* if one is employed by him to assist in the work, such sum as may be agreed upon between the employe and the assistant, *the sum so paid the assistant forms no part of the salary or compensation of the employe,* and in determining the salary of such employe the amount paid the assistant must be deducted from the total amount paid by the employer." (Italics supplied.)

There the widow of the deceased employe sought to recover upon a percentage basis of $140 per month admittedly paid her husband. The defendant established as a matter of fact that the husband, although paid $140 per month by the company, actually retained only $100 thereof because he paid the assistant $40 per month. The court said (128 Minn. 488):

"The purpose of the compensation statute was to provide a percentage income to the widow, or dependent next of kin, *based upon their pecuniary loss.*" (Italics supplied.)

Hence the pecuniary loss was measured by $100 per month, the amount actually earned by the workman, and not the $140 nominally paid by defendant. Also to be observed is the fact that no claim was made there that the assistant was not recognized by the creamery association as its employe. The only question involved was the amount of compensation going to the workman.

In the Janosek case claimant's hurdle is made even more difficult by the facts and the law as applied thereto. An excerpt therefrom is helpful. The court said (182 Minn. 508):

534

"But relators contend that the evidence does not warrant the finding that respondent was an employe of relator creamery company. The contention is based upon this situation: For several years back relator creamery company, a co-operative corporation, has employed a manager and a buttermaker, each of whom now receives a salary of $125 per month, and together receive a half cent per pound of the butter marketed, they paying other help needed. It appears under this arrangement that each earns something over $4,300 a year. Respondent was hired by the manager, who paid her bimonthly half of the agreed wages, and the buttermaker half. Another worker in the creamery was similarly hired and paid wages. *It appears that no one was hired, laid off, or discharged without the approval of the board of directors of the creamery company.* That respondent took orders from the manager does not signify much, for to anyone working in the creamery the manager thereof would be the one in command. *The manager testified he 'would not think of hiring a girl without consulting the board— could not do it.' And the situation was the same in hiring or laying off help in the manufacturing part of the business.* The directors' testimony was to the same effect, one of them stating that the *buttermaker or manager would jeopardize their own employment should either undertake to engage an objectionable person to assist in the work.*" (Italics supplied.)

In the opinion the court distinguished the facts there appearing from the case of Arterburn v. County of Redwood, 154 Minn. 338, 191 N. W. 924, saying (182 Minn. 509):

"No agent or officer of the county knew that Arterburn was hauling gravel or had made any arrangement with him to work. *In the case at bar the manager of the creamery hired respondent to work therein with the knowledge and approval of the board of directors.*" (Italics supplied.)

The Arterburn case supports relators' position here. (154 Minn. 340):

"No one can become the employe of another without the consent of the other. The law makes the employer responsible for the acts of his employes while engaged upon his business, and also compels him to compensate them for any injuries they may sustain, even if the injuries result from their own carelessness. The law could not impose such burdens upon him if those who are careless or reckless could become his employes without his consent. The relation of employer and employe is purely contractual and there is no evidence of any such relationship in this case."

What has been said under this subdivision can lead to but one conclusion, namely, that the record does not sustain the findings of the commission of the existence of an employer-employe relation.

Ordinarily we would say nothing more concerning this case, as what is now determined ends it. In view, however, of the extensive arguments of counsel and the thoroughness with which they have gone into the law respecting the second point, we have, reluctantly to be sure, concluded also to discuss that feature.

■ "The compensation act does not apply to persons whose employment is casual and not in the usual course of trade, business, profession or occupation of his employer." Billmayer v. Sanford, 177 Minn. 465, 466, 225 N. W. 426, 427. Admittedly, as we have seen, claimant was a casual employe. So unless his work was done in the usual course of relators' business no recovery can be had. We have already referred to the fact that this is the case to which the dissenting commissioner referred and made the basis for his dissent. It is interesting to note also that this undoubtedly is the reason why the referee refused to grant compensation.

It is not an easy matter to determine just what one's "business" may be, to the exclusion of something else. Of course, one may engage in several businesses or in different occupations. That has been held in several cases, and citation thereof is unnecessary. The vital question here is whether these women (relators), because they owned these properties and were receiving income therefrom, were engaged in a "business" or "occupation." Each case must rest upon its own facts. As has been said time and again, the aim of the

536

compensation act is to have the burden put upon industry, to the end that the consumer who uses the product of the industry may bear the cost of production. Its purpose is to meet economic loss. Applying the same tests and the same reasoning to the facts in the present case as were used and applied in the Billmayer case, one cannot help arriving at the same conclusion as there reached, namely, that relators "did not carry on a business or occupation within the compensation act." Here, too, as in the cited case [177 Minn. 467] "the owner of the property owns it as an investment or means of income," not as a business enterprise or occupation within the meaning of the act.

More than eight and one-half years have elapsed since the Billmayer case was filed. Several legislative sessions have been held since, yet no change has been made. For this reason, what this court recently held in Pattridge v. Palmer, 201 Minn. 387, 390, 277 N. W. 18, 20, may appropriately be repeated here:

" 'A judicial construction of a statute becomes a part of it, and as to rights which accrue afterwards it should be adhered to for the protection of those rights. To divest them by a change of the construction is to legislate retroactively.' 2 Lewis' Sutherland, Statutory Construction (2 ed.) § 485, following, inter alia, Fairfield v. County of Gallatin, 100 U. S. 47, 25 L. ed. 544.

"That rule has its ordinary application where a change of the judicial construction of a statute would operate adversely on vested rights. There are none such here, but the fact remains that, were we to overrule Luce v. Clarke [49 Minn. 356, 51 N. W. 1162] and adopt the rule which the court there refused to adopt, we would as a practical matter be amending a statute which has stood with its present effect for over 50 years, with no thought on the part of the legislature that it should be changed."

In addition to the cases cited and relied upon in the Billmayer case, the following are helpful: Lauzier v. Industrial Acc. Comm. 43 Cal. App. 725, 185 P. 870; Ford v. Industrial Acc. Comm. 53 Cal. App. 542, 200 P. 667; Edwards v. Industrial Acc. Comm. 129 Cal. App. 447, 18 P. (2d) 979; Oliphant v. Hawkinson, 192 Iowa,

1259, 183 N. W. 805, 33 A. L. R. 1433; Setter v. Wilson, 140 Kan. 447, 37 P. (2d) 50; Kaplan v. Gaskill, 108 Neb. 455, 187 N. W. 943; Fedak v. Dzialdowski, 113 Pa. Super. Ct. 104, 172 A. 187; Quick v. E. B. Kintner & Son, 113 Pa. Super. Ct. 108, 172 A. 189; Sturman v. Industrial Comm. 203 Wis. 190, 232 N. W. 864, 234 N. W. 494; Vandervort v. Industrial Comm. 203 Wis. 362, 234 N. W. 492.

The Illinois cases cited by claimant such as Storrs v. Industrial Comm. 285 Ill. 595, 121 N. E. 267, and other cases, are not of help here. The Illinois act is essentially different from ours. Liability there may be imposed upon the owner who is in the business of building, *maintaining*, repairing, or demolishing buildings and structures. Obviously, if relators here were to be held to responsibility, it would be because of *maintaining* these structures. If our legislature intended to include maintenance of a building employed for rental purposes as a basis for liability, undoubtedly it would have so stated. At any rate, we have no business amending the act. In Nelson v. Stukey, 89 Mont. 277, 287, 300 P. 287, 289, 78 A. L. R. 483, the court held the owner responsible to an injured workman because "defendant operated the original apartment for the purpose of gain. The addition, which was to cost approximately $50,000, was being built for use for the same purpose." The workman was injured while employed on the new structure. The original structure contained 15 apartments; the addition 23. Naturally, the court could well say that the owner (a dentist) was engaged in more than one business or enterprise. The size and extent of that enterprise made the dentist also an operator of a business. The facts there appearing are obviously not comparable to the facts in the instant case.

Order reversed.

PETERSON, JUSTICE (dissenting).

Much of what is said in the majority opinion would be unanswerable if we had the fact-finding function. Our review is limited to determining whether or not there is any evidence or any inference permissible therefrom to sustain the finding of the commission. Jeffers v. Borgen Chevrolet Co. 199 Minn. 348, 272 N. W. 172; Bron-

son v. National Battery Broadcasting Co. Inc. 200 Minn. 237, 273 N. W. 681; Ledoux v. Joncas, 163 Minn. 498, 204 N. W. 635.

■ Of course there can be no liability unless there was an employment. In some of the cases we speak about the right of control as being a test by which to determine if the relation exists in a particular case. In a certain sense this is getting the cart before the horse. The right of control flows from the relationship. There can be no right of control unless the relation of employer and employe actually exists. All the incidents of employer and employee result from the relation. But if we find the incidents in the particular case which normally exist only where there is a contract of employment, then it seems a fair inference that such a contract actually exists. Whether such inferences should be drawn is not for us but for the commission. We can only say that the facts exist from which such an inference may be drawn. In this case the contract contemplated that Ritchie would necessarily have to employ others to assist him, from which an inference might be drawn that employes would be brought upon the premises to render services to relators. The fact that the services were menial in character and rendered directly to relators would justify some inference of a right of control. Wass v. Bracker Construction Co. 185 Minn. 70, 240 N. W. 464. In this case there is some evidence that the relators actually exercised some control, so that we have not only the right of control but the fact of control. Olson v. Eck's Homemade Sausage Co. 194 Minn. 458, 261 N. W. 3. What inferences should be drawn from the method of payment employed in this case is for the commission and not for us as a matter of law. It appears that payment in the first instance was made by relators' agent, Cathcart & Maxfield, Inc., and it stands undisputed that this firm was not at any time the agent of Ritchie. The wages were paid by this firm as the agent of relators. It is true that subsequently the amount paid was charged to Ritchie and an adjustment made. But ordinarily payments are not made by one on behalf of another except as the latter's agent. Whether the reimbursement of relators by Ritchie was because of his contract or for other reasons was a question of fact to be determined by the commission.

Upon all the evidence, it seems that numerous inferences of the existence of employment may be drawn from the existence of facts which would exist only in a case in which there was an actual employment.

■ Whether a person is engaged in a business in a particular case is a question of fact. We clearly indicated in Sink v. Pharaoh, 170 Minn. 137, 212 N. W. 192, 50 A. L. R. 1173, that a person may embark in the owning or letting of property so that it would result in a business or occupation and that a person might have more than one business or occupation at the same time; and in Billmayer v. Sanford, 177 Minn. 465, 466, 225 N. W. 426, 427, we held that the renting of property "may reach such proportions as to require an affirmative conclusion [that is, it may amount to a business], but this case does not seem to be such. *Each case must rest upon its own facts."* Whether the owning, operating, and leasing of a 15-flat building, furnishing heat, a janitor and other services to tenants, has reached the proportions of a business enterprise is a question of fact. Certainly the line must be drawn somewhere, and where, as here, the enterprise has all the earmarks of a commercial undertaking, it seems that it should be for the commission and not us to determine the fact. We have held that owning one or more pieces of property and renting the same out to tenants is not a business or occupation of the owner. In State ex rel. Lennon v. District Court, 138 Minn. 103, 106, 164 N. W. 366, 368, we held that the renting of a farm by the owner to a tenant was not a business or occupation within the meaning of the statute and that a business, trade, or occupation of a person refers "to that branch of the world's activities wherein he expends his usual everyday efforts to gain a livelihood." In Sink v. Pharaoh, 170 Minn. 137, 212 N. W. 192, 50 A. L. R. 1173, we held that ownership of one small house rented out by the owner did not constitute a business or occupation. In Billmayer v. Sanford, 177 Minn. 465, 225 N. W. 426, we held that the ownership of four houses rented out to eight or nine tenants did not constitute a business or occupation. But in Sink v. Pharaoh, 170 Minn. 137, 212 N. W. 192, 50 A. L. R. 1173, at p. 139, we said:

"We can well conceive that a person may embark in the owning and letting of houses so that it results in a business or occupation. * * * True, a person may engage in more than one business or be in a profession and a business at the same time."

In this case the properties were two apartment buildings containing 15 apartments, one of which was occupied by the janitor and the other 14 leased to tenants under an arrangement whereby, in addition to the renting of the properties, the relators were to furnish heat, repairs, and various services. The relators' ancestor operated these properties as a commercial venture, from which she received a substantial income, and the relators continued to operate them in the same manner. The finding of the commission is sustained by reason of the fact that it appears that the properties were owned and operated as a business venture and not simply as an investment from which the relators received an income. See Keegan v. Keegan, 194 Minn. 261, 260 N. W. 318, in which owners of an apartment building were held liable for workmen's compensation. The fact that relators were housewives also does not preclude the finding made by the commission. Sink v. Pharaoh, *supra.*

Quite contrary to what is held in the majority opinion, Billmayer v. Sanford and our other decisions have not foreclosed our holding that the commission may find that relators were engaged in a business. The rule that the construction of a statute becomes a part thereof so as to bind the court in future cases has no application here. The construction which we placed upon the statute in Sink v. Pharaoh and Billmayer v. Sanford left the question wide open for decision in each particular case, whether the owning and letting of property had reached such proportions as to be held a business or occupation of the owner. Quite contrary to our prior decisions, we now hold that this cannot be done. Our prior decisions, if it be conceded they were part of the statute, provided for the adaptation of the statute to each particular case. The decision in the instant case forecloses that right. It will require legislative action to permit a holding that the owning, operating, and receiving in-

come from residential or apartment properties is in fact a business or occupation of the owner.

The authorities from other jurisdictions are divided. If we follow Sink v. Pharaoh and Billmayer v. Sanford, we would be bound to reject the rule of Storrs v. Industrial Comm. 285 Ill. 595, 121 N. E. 267, and adopt the rule in Nelson v. Stukey, 89 Mont. 277, 300 P. 287, 78 A. L. R. 483. Some of the decisions cited have no value here as authority because they are opposed to the principles which we have already announced in other cases. Under the rules which we have announced in many cases, the decision of the commission should be affirmed whether we would have found the facts as the commission did or otherwise.

GALLAGHER, CHIEF JUSTICE (dissenting).
I concur in the dissent of Mr. Justice Peterson.

