ELEANOR FITZGERALD v. ECONOMIC LABORATORY, INC. AND ANOTHER.[1]

December 31, 1943.

No. 33,509.

*Reynolds & McLeod,* for relators.
*Kelly & Mangan,* for respondent.

MAGNEY, JUSTICE.

*Certiorari* to review the order of the industrial commission, dated January 5, 1943, vacating the order of a referee and awarding com-

[1]Reported in 12 N. W. (2d) 621.

pensation to Eleanor Fitzgerald for the death of her husband. The Liberty Mutual Insurance Company is the insurer.

Relator is engaged in the manufacture and sale of kitchen cleansers. Its home office is in St. Paul, Minnesota. Its factories, branch offices, and warehouses are located in several states. On September 27, 1937, George R. Fitzgerald, who resided in Des Moines, wrote relator at St. Paul, applying for a position as salesman. On October 3, Donald F. Killorin, an assistant sales manager of relator, stopped off at Des Moines on his way to St. Louis and interviewed Fitzgerald. His impression of Fitzgerald was favorable. An application blank was filled out that day by Fitzgerald and mailed to the St. Paul office by Killorin. E. B. Osborn, vice president in charge of sales, usually made the decision when a new employe was hired. In this case, Killorin had received authority from Osborn to employ Fitzgerald before he left St. Paul. On October 4, Killorin wrote Miss Koran, another assistant sales manager, and secretary of the company, that he "did not take him on the spot," and asked her to check Fitzgerald's references and push the bond through for checking. On the same day, Killorin wired from St. Louis and asked Fitzgerald to come to St. Louis "per proposition discussed Sunday." At the interview in Des Moines, Killorin arranged that Fitzgerald be paid $125 per month and travel allowance. It was understood that Fitzgerald's employment at St. Louis was to be "a temporary connection" during the illness of Mr. Cole, the sales director at St. Louis. He was told by Killorin that if Mr. Cole survived and if Fitzgerald had ability and could prove himself, he would likely be given a "junior territory" in Grand Rapids, Michigan. This arrangement was confirmed in writing by the home office in a letter to Fitzgerald. The home office also checked the references. The bond was supplied by the home office and kept on file there. On October 11, Osborn wrote Killorin, who was still in St. Louis: "If you have any questions about continuing with Fitzgerald as our permanent selection, let's get together." Osborn approved the temporary arrangements made by Killorin, and on October 15 placed Fitzgerald on the St. Paul office payroll.

Fitzgerald commenced work in St. Louis on October 6. He worked there less than a month under Killorin's supervision. Then he received training in Chicago for a month and in Detroit for a week. In December 1937, he was given the "junior territory" in Grand Rapids, a part of the Detroit territory. On January 1, 1938, his salary was increased to $150 a month and expenses. In April and May, he was on a straight commission basis. In May 1938, he was put back on a salary basis, and on January 1, 1939, he was again on straight commission, with expense arrangements. Fitzgerald never worked in Minnesota. After he was permanently employed his work was confined entirely to the state of Michigan. On January 12, 1942, he was fatally injured in an accident arising out of and in the course of his employment.

Fitzgerald took orders for merchandise. He usually sent them to the St. Paul office, but sometimes direct to the plant in Chicago for shipment. The Chicago office would send the orders it received to the St. Paul office. He carried on some credit business with customers whose credit was approved by the St. Paul office. The money he collected was remitted to that office. His daily report to the St. Paul office set forth the customers he called upon and the amount of the orders. A copy was sent to Mr. Wirth in Detroit, his supervisor, who was in charge of the branch office in Detroit. The St. Paul office made suggestions to him with reference to the manner of handling the business, sometimes directly and more often through his supervisor. Bulletins went out to supervisors and salesmen alike. Final decision as to what towns and territory he was to work was determined in the St. Paul office. Catalogs and price lists were all sent him from the home office. Wirth, the manager of the Detroit branch, received 25 percent of the total commission paid to Fitzgerald based on his supervision. The salary and commission checks were mailed to Fitzgerald from the St. Paul office. The expense sheets were submitted to the St. Paul office, checked by its auditors, and paid from there.

The recited facts conclusively indicate that the business of relator was localized in the state of Minnesota. In several cases, be-

ginning with State ex rel. Chambers v. District Court, 139 Minn. 205, 166 N. W. 185, 3 A. L. R. 1347, this court has held that where a business is localized in this state it is the purpose of the statute to compensate for injuries in a service incidental to its conduct, though sustained beyond the borders of the state. State ex rel. Maryland Cas. Co. v. District Court, 140 Minn. 427, 428, 168 N. W., 177; State ex rel. McCarthy Brothers Co. v. District Court, 141 Minn. 61, 169 N. W. 274; Stansberry v. Monitor Stove Co. 150 Minn. 1, 183 N. W. 977, 20 A. L. R. 316; Krekelberg v. M. A. Floyd Co. 166 Minn. 149, 207 N. W. 193; Bradtmiller v. Liquid Carbonic Co. 173 Minn. 481, 217 N. W. 680; Brameld v. Albert Dickinson Co. 186 Minn. 89, 242 N. W. 465; Rice v. Keystone View Co. 210 Minn. 227, 297 N. W. 841.

In the Chambers case, where the principle was first announced, this court, in the words of Mr. Justice Dibell, stated (139 Minn. 209, 166 N. W. 185):

"A basic thought underlying the compensation act is that the business or industry shall in the first instance pay for accidental injuries as a business expense or a part of the cost of production. It may absorb it or it may put it partly or wholly on the consumer if it can. * * * When a business is localized in a state there is nothing inconsistent with the principle of the compensation act in requiring the employer to compensate for injuries in a service incident to its conduct sustained beyond the borders of the state. * * * What the employee did, if done in Minnesota, was a contribution to the business involving an expense and presumably resulting in a profit. It was not different because done across the border in North Dakota. It was referable to the business centralized in Minnesota."

This court has applied this theory in all the later cases.

Relator contends that the industrial commission awarded compensation upon the sole premise that the business was localized in this state and that it was in error to do so. It insists that the contract for hire was made outside the state; that the performance of

the contract was entirely outside the state and in a state where relator had a business situs; that the harm occurred outside the state; and that because of these facts the Minnesota law is not applicable.

In many cases it is difficult to determine in which state a contract of employment is entered into. This is one of those cases. Here the employe wrote the relator a letter from his home in Des Moines applying for a position as salesman. Later he was interviewed in Des Moines. At the interview he filled out an application blank, which was mailed to the St. Paul office. The references given in the application were checked by the home office. The bond was furnished by the home office. The home office in a letter to the employe confirmed the understanding for hiring which the assistant sales manager made with Fitzgerald in Des Moines and St. Louis. The contract was not complete until this confirmation had been given. The place where the last act necessary to give validity to a contract is done is the place where the contract is made. This first arrangement with Fitzgerald provided for a temporary connection with relator only. He was not employed on a permanent basis, but was told that if he made good on the temporary job he might be given a "junior territory" in Michigan. After he had proved himself as a salesman, he was employed permanently and assigned to the Grand Rapids territory in Michigan. When he went to Michigan it was a new hiring for that work. The contract certainly was not made in Iowa or Missouri, and the Michigan district manager had no authority to hire. There is nothing in the record to indicate that the contract for permanent employment was made outside the state of Minnesota. Whether the arrangement which was made with Fitzgerald at the outset was an Iowa or Missouri contract is immaterial. The employment contract under which Fitzgerald was working at the time of his death was neither an Iowa nor a Missouri contract.

During the time he worked in Michigan there were several changes in his employment contract relative to his remuneration. At times he was on a salary with an expense account and some-

times on a commission with an expense account. At all times he was carried on the payroll in the St. Paul office.

In Minnesota, "business localization" has become an important factor in determining whether the Minnesota act will be applied under facts similar to those we have here. In some of the later cases, where the employer's business was localized in this state and the harm occurred outside the state, the place of contract is not mentioned. Stansberry v. Monitor Stove Co. 150 Minn. 1, 183 N. W. 977, 20 A. L. R. 316; Bradtmiller v. Liquid Carbonic Co. 173 Minn. 481, 217 N. W. 680; and Brameld v. Albert Dickinson Co. 186 Minn. 89, 242 N. W. 465, *supra*. In the Stansberry case this court said:

"The territory in which Stansberry traveled was for the most part in North Dakota. The business in which he was engaged was localized in this state, and, in such a case, our compensation act applies and compensates for injuries in a service incident to its conduct, sustained beyond the borders of the state."

In the Bradtmiller case, one of those where the place of the contract is not referred to, the business was localized in Minneapolis, and the employe was injured outside the state. The court there stated (173 Minn. 482, 217 N. W. 680):

"* * * There is enough to sustain a holding that there was a localization of the business in Minnesota and that the plaintiff was associated wholly with the work done there."

In the Brameld case, the facts are similar to those in the instant case. The employer's business was localized in Minneapolis. The deceased was employed as a traveling salesman in Iowa. His home was in that state. He was engaged in the course of his employment when he was fatally injured near Mason City, Iowa. There is nothing in the case indicating where the employment contract was entered into. The court said (186 Minn. 91, 242 N. W. 465):

"* * * The character of his work and his arrangement with the Dickinson company were such as to bring him within the compensation act though he worked outside the state."

In State ex rel. Maryland Cas. Co. v. District Court, 140 Minn. 427, 168 N. W. 177, *supra,* no stress is laid on the fact that it was a Minnesota contract. The same is true of State ex rel. Chambers v. District Court, 139 Minn. 205, 166 N. W. 185, 3 A. L. R. 1347; State ex rel. McCarthy Brothers Co. v. District Court, 141 Minn. 61, 169 N. W. 274; and Krekelberg v. M. A. Floyd Co. 166 Minn. 149, 207 N. W. 193, *supra.*

This question is ably discussed by Professor Ralph H. Dwan in his article "Workmen's Compensation and Conflict of Laws—The Restatement and Other Recent Developments," published in 1936 in 20 Minn. L. Rev.

Relator relies on Rice v. Keystone View Co. *supra,* decided in 1941. In that case the contract of employment was made in Minnesota. The employer was an Illinois corporation, doing business in this state. The employe was fatally injured in South Dakota while in the course of his employment. This court said (210 Minn. 231, 297 N. W. 843):

"* * * We think that the maintenance of a resident employe to further its business interests in this state sufficiently localizes an employer's business to make applicable to it the provisions of our workmen's compensation act. Where a business is localized in this state an employe performing services pertaining to that business is within the protection of our compensation law although *some* of his services may be performed and an accident to him may have occurred outside the state." (Italics supplied.)

Relator stresses the use of the word "some" in the foregoing statement and insists that, since all the services of the employe in the instant case were performed in Michigan, the Minnesota act does not apply. As we interpret Rice v. Keystone View Co., it does not hold that where a business is localized in this state an employe is outside the protection of our compensation law if all his services are performed and an accident to him occurs outside the state. All it holds is that the employe is within the protection of the law although some of his services, under the facts in that case, were

performed outside the state and the accident occurred there. In Brameld v. Albert Dickinson Co. 186 Minn. 89, 242 N. W. 465, *supra,* the employe's work was entirely in the state of Iowa, and it was held that he came within the protection of the Minnesota compensation act. We find the same situation in Bradtmiller v. Liquid Carbonic Co. 173 Minn. 481, 217 N. W. 680; State ex rel. Maryland Cas. Co. v. District Court, 140 Minn. 427, 168 N. W. 177; and State ex rel. McCarthy Brothers Co. v. District Court, 141 Minn. 61, 169 N. W. 274, *supra.*

The writ is discharged and the decision of the commission is affirmed. Respondent is allowed $100 attorney's fees in addition to statutory costs.