# GRACE ETHEL ALECKSON v. KENNEDY MOTOR SALES COMPANY AND ANOTHER.[1]

November 28, 1952.

No. 35,795.

[1]Reported in 55 N. W. (2d) 696.

*C. A. Stark,* for relators.

*Van Valkenburg, Blaisdell & Moss,* for respondent.

MATSON, JUSTICE.

Certiorari to the industrial commission to review an award of compensation to a dependent widow and minor child.

Aside from questions as to where the contract was made, and as to whether an employment relationship ever existed, we have this issue: Where the employer's business is localized in Minnesota, does the industrial commission have jurisdiction to award compensation where the employment is referable to such Minnesota localized business when the employe (1) is employed under a contract made in Illinois, and (2) is fatally injured in Wisconsin while driving the employer's automobile from Illinois to Minnesota?

The deceased employe herein, Elmer A. Aleckson, as a resident of Illinois, operated a full-time insurance brokerage business in Chicago which yielded him annual earnings in excess of $15,000. In

1945 his wife and daughter, because of the latter's health, moved to Spring Lake Park, Minnesota, where they have resided ever since. Aleckson continued to reside in Illinois. Between 1945 and March 4, 1950, when he sustained the fatal injuries involved herein, Aleckson drove his automobile nearly every week end from Chicago to Minnesota to visit his family.

The employer, Kennedy Motor Sales Company (hereinafter called the Kennedy Co.), a Minnesota corporation, was engaged in buying and selling used cars. Its only sales lot was in St. Paul. Since the Minnesota market did not supply enough used cars, such cars were bought principally in Chicago. Kennedy Co. bought such automobiles f. o. b. the seller's lot in Chicago and arranged for their transportation to St. Paul at its own expense. The cars were usually transported to St. Paul by means of motor carriers at an average cost of from $45 to $52.50 per car. If a single vehicle were purchased, it was driven to St. Paul by a Kennedy Co. employe, or by Aleckson, or it would be stored in Chicago until enough cars for a full carrier load were accumulated.

Early in 1948, Irving Shapiro, a majority stockholder in Kennedy Co., met Aleckson in Chicago. At that time an informal arrangement was made between them whereby, if Kennedy Co. had a car in Chicago for transportation to St. Paul, Aleckson would drive the same to St. Paul while en route to visit his family. *Between June 1948 and March 1950* Aleckson drove at least 12 Kennedy Co. cars from Chicago to St. Paul. He would leave Chicago Friday afternoon and arrive at his wife's residence at Spring Lake Park Friday night. He would then use the car over the week end for personal purposes such as shopping, taking his daughter to the doctor, sightseeing, and going to church and to the movies. On Sunday night before leaving for Chicago on the train Aleckson would deliver the car to the Kennedy Co. sales lot in St. Paul and place the car keys, together with a written statement of his actual out-of-pocket expense incurred for gasoline, oil, and repairs, in an envelope which he deposited in a mail box. His expense statements varied from $6.08 to $20 but were usually under $10. These amounts were

the only sums of money received by Aleckson. At no time did the Kennedy Co. deduct social security or income tax from these amounts and at no time was Aleckson carried on the payroll as an employe.

On Friday, March 3, 1950, Aleckson was at his office in Chicago; he was planning to drive to Spring Lake Park later in the day in his own car. Maynard Abramson, manager of Kennedy Co., telephoned from St. Paul to Thomas P. O'Neill in Chicago. O'Neill owned a car agency in Chicago and was a friend of Aleckson. Abramson asked O'Neill, in effect, whether Aleckson was going to Minnesota that week end and, if he were, whether he would be willing to drive a Cadillac convertible to the Kennedy Co. lot in St. Paul. O'Neill kept the St. Paul line open while he talked to Aleckson on another phone to ask him if he wanted to drive the Kennedy Co. car to St. Paul. Aleckson agreed to do so and O'Neill informed Abramson of Aleckson's acceptance.

Aleckson picked up the car at a Chicago lot and proceeded to Minnesota. Near Baldwin, Wisconsin, he collided with a truck. He was hospitalized in Baldwin and incurred hospital, doctor, and ambulance bills there in a sum of $285.20. He was moved to Northwestern Hospital in Minneapolis where he died on March 7, 1950. His expenses there amounted to $1,023.00; burial expenses were in excess of the $350 statutory burial expense. His sole beneficiaries under the workmen's compensation act are his wife and daughter.

A majority of the industrial commission found that Aleckson, at the time he sustained his injuries, was an employe of the Kennedy Co. under a Minnesota contract of hire with wages in excess of $60 per week. A compensation award of $30 weekly was made to his widow and a daughter as total dependents. A further sum of $1,308.20 was awarded for medical, hospital, and nursing services and $350 for burial expense. We are asked to reverse the award on the ground that no contract of employment existed between the employer and Aleckson and on the further ground that, if a contract of employment did exist, such contract was made in Illinois with the result that the Minnesota industrial commission had no

jurisdiction pursuant to DeRosier v. Jay W. Craig Co. 217 Minn. 296, 14 N. W. (2d) 286.

■ Liability for benefits under the compensation act does not arise unless the relationship of employer and employe has first been created by an express or implied contract for hire pursuant to which the employer pays wages directly to the workman for the latter's services.[2] Relators contend that we here have no contract to pay wages in return for services. The nature of the relationship of the parties is to be ascertained not from the label given to it by the parties themselves but from the consequences which the law attaches to their arrangements and to their conduct.[3] Obviously the parties did enter into a contractual relation whereby Aleckson agreed to drive the Cadillac from Chicago to St. Paul. Even though contractual, the question remains whether the arrangement was anything more than an accommodation bailment whereby the Cadillac was lent to Aleckson for his personal convenience in driving to Minnesota to visit his family. The fact that Kennedy Co. always reimbursed him for gasoline, oil, and repair expenses indicates that it was something more than for his personal accomodation. Relators insist, however, that a master-and-servant relationship did not arise because Kennedy Co. exercised no control over Aleckson's time of departure, his route, or anything else. It is well established, however, that the *right* of control, and not necessarily the exercise of that right, is the test of the relationship of master and servant.[4] The degree of control exercised varies according to the nature of the work. Although the right of control exists, the work in a particular case may be of a character which neither requires nor justifies

[2] See, M. S. A. 176.01, subds. 5 and 8(2); Jackson v. Cathcart & Maxfield, Inc. 201 Minn. 526, 277 N. W. 22; Amundsen v. Poppe, 227 Minn. 124, 34 N. W. (2d) 337; Pederson v. Pederson, 229 Minn. 460, 39 N. W. (2d) 893; Toenberg v. Harvey, 235 Minn. 61, 49 N. W. (2d) 578; 1 Larson, Workmen's Compensation Law, § 47.10.

[3] See, Wass v. Bracker Const. Co. 185 Minn. 70, 240 N. W. 464.

[4] Frankle v. Twedt, 234 Minn. 42, 47 N. W. (2d) 482; Cornish v. Kreuer, 179 Minn. 60, 228 N. W. 445.

its exercise. In Frankle v. Twedt, 234 Minn. 42, 48, 47 N. W. (2d) 482, 487, we pointed out that—

"* * * As applied to motor vehicles, it has been held that, although an owner requested her brother to proceed unattended with her automobile to a distant city and return, during the course of which trip *she could not possibly direct in detail her brother's physical movements,* the right of control was sufficient to render the relationship between them that of master and servant rather than that of bailor and bailee, *even though the trip was in part for the brother's personal benefit.* Le Sage v. Le Sage, 224 Wis. 57, 271 N. W. 369; * * *." (Italics supplied.)

■ As a basis for an inference that a right of control did exist, the industrial commission could reasonably take into consideration (1) that the automobile was owned by Kennedy Co.; (2) that by the every nature of motor vehicle driving it would have been impractical to exercise any direct supervision of the car's operation; (3) that it is the custom to permit a chauffeur, whenever convenience so dictates, to proceed unaccompanied by the owner;[5] (4) that Kennedy Co. could at all times terminate Aleckson's services by denying him the use of the car;[6] and (5) that Aleckson in any event was required to deliver the vehicle to a specific destination by a certain time, namely, to the car lot in St. Paul not later than Monday morning. It is not to be overlooked that a liberal interpretation of the compensation act to accomplish its purpose precludes a technical and narrow application of tests used in determining whether an employer-employe relationship exists.

■ Liability under the compensation act does not arise, however, unless the employer-employe relationship is accompanied by the payment of wages by the employer directly to the employe. § 176.01,

---

[5] See, Frankle v. Twedt, *supra.*

[6] In compensation cases, an unrestricted right of discharge is strictly indicative of a right of control. See, Korthuis v. Soderling & Sons, 218 Minn. 342, 16 N. W. (2d) 285; Anfinson v. A. O. U. W. Ins. Co. 212 Minn. 183, 3 N. W. (2d) 7; Nesseth v. Skelly Oil Co. 176 Minn. 373, 223 N. W. 608.

subd. 5.[7] It is established here and elsewhere that in order to have the payment of wages there need not be actual payment of pecuniary compensation if, in consideration of services, the employe receives from the employer any services, goods, or accommodations of substantial financial value such as farm work, fuel, heat, light, clothing, board, lodging, laundry, or tuition.[8] The commission could reasonably find that Aleckson, in exchange for his services in driving and delivering the Cadillac to St. Paul, received the equivalent of wages in that he was thereby provided with a means of personal transportation from Chicago to Minnesota. He received something of computable value in that he did not have to pay for the gasoline and oil which he would have used had he driven his own car. He was also saved the wear and tear of his own vehicle, and upon arrival he had the use of the Cadillac in shopping for his family, taking his daughter to the dentist, going to church, and pleasure driving around the Twin Cities.

■ Was decedent, however, excluded because he was only a *casual* worker? Section 176.05 specifically excludes from compensation coverage "persons whose employment at the time of the injury is. casual, and not in the usual course of the trade, business, profession, or occupation of his employer; * * *." In Billmayer v. Sanford, 177 Minn. 465, 467, 225 N. W. 426, 427, we said:

---

[7]The requirement that wages be paid is in fulfillment of the purpose of the compensation act which is to pay benefits to restore a part of the wages lost and such benefits can be computed only on a basis of earnings. See, 1 Larson, Workmen's Compensation Law, § 47.10.

[8]See, Supornick v. Supornick, 175 Minn. 579, 222 N. W. 275; Schneider v. Salvation Army, 217 Minn. 448, 14 N. W. (2d) 467; Otten v. University Hospitals, 229 Minn. 488, 40 N. W. (2d) 81; Judd v. Sanatorium Comm. 227 Minn. 303, 35 N. W. (2d) 430; Cosgriff v. Duluth Firemen's Relief Assn. 233 Minn. 233, 46 N. W. (2d) 250; Smith v. Jones, 102 Conn. 471, 129 A. 50, 43 A. L. R. 952; Hartford Acc. & Ind. Co. v. Industrial Acc. Comm. 139 Cal. App. 632, 34 P. (2d) 826; Union Lbr. Co. v. Industrial Acc. Comm. 12 Cal. App. (2d) 588, 55 P. (2d) 911; Bennett v. Baldwin, 108 Ind. App. 158, 27 N. E. (2d) 396; City of Sheboygan v. Industrial Comm. 202 Wis. 420, 232 N. W. 871.

"* * * Where the employment cannot be characterized as permanent or periodically regular, but occurs by chance, or with the intention and understanding on the part of both employer and employe that it shall not be continuous, it is casual."[9]

Since decedent had driven at least 12 of the employer's cars to St. Paul between June 1948 and March 1950, the commission could well find that decedent's employment was periodically regular and did not occur by mere chance. Furthermore, the employment was not only performed with periodic regularity but was performed in the usual course of the employer's business in that it was a customary business practice for the employer to buy used cars in Chicago and to arrange for their transportation to St. Paul for sale. In fact, a dependable and regular supply of out-of-state used cars was essential to the employer's business. Where it appears, as here, that the employer and the employe have a well-developed understanding extending over a substantial period of time that the latter shall periodically perform, in the usual course of the employer's business, a particular kind of service for the employer, the employment ceases to be casual.

▆▆▆▆ The commission's findings that an employer-employe relationship existed by virtue of a contract of hire pursuant to which wages were directly paid by Kennedy Co. to Aleckson are sustained by the evidence. Relators contend, however, that the contract for hire was made in Illinois and that, therefore, pursuant to DeRosier v. Jay W. Craig Co. 217 Minn. 296, 14 N. W. (2d) 286, the commission is without jurisdiction. Assuming for the purpose of this decision that the contract was made in Illinois,[10] we must disagree with the contention that the commission was without jurisdiction despite strong dicta in the DeRosier case. In applying the Minnesota business localization test, the place of the making of the con-

[9]See, also, Amundsen v. Poppe, 227 Minn. 124, 34 N. W. (2d) 337; 33 Minn. L. Rev. 555.

[10]In Fitzgerald v. Economic Laboratory, Inc. 216 Minn. 296, 300, 12 N. W. (2d) 621, 623, we pointed out that: "The place where the last act necessary to give validity to a contract is done is the place where the contract is made."

tract of employment—although it may possibly be an evidentiary factor in determining where the employer's business is localized— is of no controlling significance in determining jurisdiction. This becomes clear when we study the history and application of the business localization theory as applied in our decisions throughout the years. In State ex rel. Chambers v. District Court, 139 Minn. 205, 209, 166 N. W. 185, 187, 3 A. L. R. 1347, wherein the localization theory was first set forth and applied, we said:

"* * * When a business is localized in a state there is nothing inconsistent with the principle of the compensation act in requiring the employer to compensate for injuries in a service incident to its conduct sustained beyond the borders of the state. * * * In the case before us the business of the employer was localized in the state. *What the employee did,* if done in Minnesota, was a contribution to the business involving an expense and presumably resulting in a profit. It was not different because done across the border in North Dakota. *It was referable to the business centralized in Minnesota.*" (Italics supplied.)

The business localization test as promulgated in the Chambers case clearly predicated jurisdiction not merely upon the localization of the employer's business but also upon the further jurisdictional fact *that the employe's services,* although performed in another state, *were referable to the business localized in Minnesota.* The jurisdictional requirement that the employment must be referable to the place where the business is localized has been implicitly recognized in our decisions although the word *referable* has not always been used.[11] Where the employer has only one business localization there usually is little occasion to emphasize or discuss

[11]See, State ex rel. Maryland Cas. Co. v. District Court, 140 Minn. 427, 168 N. W. 177; Krekelberg v. M. A. Floyd Co. 166 Minn. 149, 207 N. W. 193; Ginsburg v. Byers, 171 Minn. 366, 214 N. W. 55; Bradtmiller v. Liquid Carbonic Co. 173 Minn. 481, 217 N. W. 680; Rice v. Keystone View Co. 210 Minn. 227, 297 N. W. 841; Fitzgerald v. Economic Laboratory, Inc. 216 Minn. 296, 12 N. W. (2d) 621.

the referability of the employe's services.[12] Where, however, the business is localized in more than one state it becomes jurisdictionally important to know to which of the various business localizations the employment is referable. In the DeRosier case (217 Minn. 296, 14 N. W. [2d] 286), the employer's principal office was in Minnesota but the evidence showed the employer's business was also localized in South Dakota where the employment contract was made and where the employe's services were supervised and performed. The employe's work had no connection with Minnesota aside from the fact that the employe's pay checks were drawn by the employer on a Minneapolis bank. Clearly, the employe's services were referable to the employer's South Dakota business localization. Obviously, once the business in question was found to be localized in South Dakota and that the employe's services were referable to that localization, Minnesota's lack of jurisdiction was established and it was wholly unnecessary to the DeRosier decision to hold that the place of contract, or the place of injury, was of jurisdictional significance. Insofar as the DeRosier case holds the place of contract or the place of injury to be of controlling jurisdictional significance, it is hereby expressly overruled.

In the instant case it is therefore immaterial whether the contract of employment was made in Illinois or in Minnesota. Unquestionably upon the evidence the employer's business was localized in Minnesota and the employe's services at the time of his injury were referable to such business localization. Where, as here, an employer's business is localized in Minnesota, and the employe's services at the time of the injury are referable to the Minnesota business localization, the industrial commission has jurisdiction under the compensation act, and it is immaterial that the contract was made in Illinois and that the injuries were sustained in Wisconsin.

The award of the industrial commission is affirmed. Respondent is allowed $300 attorneys' fees in addition to statutory cost.

Affirmed.

[12]See, *e. g.*, State ex rel. McCarthy Brothers Co. v. District Court, 141 Minn. 61, 169 N. W. 274, as an example of a case where no issue was made of the referability.