350 P.2d 659

**Charles W. POSEY, Petitioner,**

**v.**

**INDUSTRIAL COMMISSION of Arizona and Jack Cummard, H. R. Larson and A. R. Kleindienst, as members of said Commission, and Merritt-Chapman & Scott Corporation, Respondents.**

**No. 6660.**

Supreme Court of Arizona.

March 16, 1960.

246

Minne & Sorenson and Ben C. Pearson, Phoenix, for petitioner.

John R. Franks, Phoenix, for respondent Industrial Commission of Arizona.

Shimmel, Hill & Kleindienst, Phoenix, for respondent Merritt-Chapman & Scott Corporation.

BERNSTEIN, Justice.

Petitioner seeks by certiorari to review an award of The Industrial Commission of Arizona (hereinafter called the "Commission") which denied his claim for workmen's compensation on the ground that petitioner "was not under a contract of hire, either express or implied * * * at the time of his injury by accident on October 18, 1957" and, further, that petitioner "did not sustain injury by accident arising out of and in the course of his employment * * *."

At the date of the accident petitioner was a member of Construction, Production and Maintenance Laborers' Local Union No. 383 (hereinafter called the "Union"), which was one of the parties, together with other unions and various contractors, including Merritt-Chapman & Scott Corporation (hereinafter called "Merritt-Chapman"), to the Arizona Master Labor Agreement and Wage Scales (hereinafter called the "Master Agreement"). On October 17, 1957, the personnel director of Merritt-Chapman telephoned the dispatcher of the Union at Phoenix to place an order for a member of the Union to fill the job classification of watchman for Merritt-Chapman at the Glen Canyon Damsite. That same day the Union dispatcher filled

out and gave to petitioner a slip entitled "Work Clearance," which, under the heading of the Union, named Merritt-Chapman and its personnel director, set forth the classification of work as watchman, specified the wage per hour, and contained the clause: "In response to your request we are referring Mr. Chas. Posey." The Union dispatcher testified that reference to "a half day's travel time plus transportation expense of $5" was noted in writing on the reverse side of the work clearance slip. The next day petitioner left Phoenix by automobile to drive to the Glen Canyon Damsite, but before reaching his destination he became involved in an accident as a result of which he sustained the injuries for which he is claiming compensation.

The initial question presented is whether the finding of the Commission that petitioner at the time of the accident was not under a contract of hire with Merritt-Chapman is supported by competent evidence. All parties, in effect, concede the materiality of that finding and agree that petitioner is not entitled to compensation unless a contract of employment between petitioner and Merritt-Chapman was in existence on October 18, 1957.

Petitioner claims that the request made by Merritt-Chapman to the Union for a watchman constituted an offer on the terms and conditions set forth in the Master Agreement and that petitioner duly accepted that offer when he received the work clearance slip and proceeded directly to the jobsite. Merritt-Chapman's denial of these conclusions makes it clear that the disagreement between the parties is not over the applicable rules of law but over the proper inferences to be drawn from the evidence.

Neither party disputes that the events which led to petitioner's ill-fated trip to the Merritt-Chapman jobsite conformed to the procedure contemplated in the Master Agreement and customarily followed by the parties. The stated purposes of the Master Agreement are to assure the contractors, such as Merritt-Chapman, who "are engaged in contract construction work in Arizona" and who "employ large numbers of members of the various Unions," including the Union here involved, "of their ability to procure employees * * * in sufficient numbers and skill to assure continuity of work in the completion of their construction contracts" and "to establish uniform rates of pay, hours of employment and working conditions which shall be applicable to all employees performing any work for the contractors * * *."

Paragraph B of Article II of the Master Agreement provides:

"The Unions agree to furnish such employees as may be requisitioned by the Contractors within forty-eight (48) hours; but in the event the Unions are unable to furnish such requisitioned employees within forty-eight (48)

hours, the Contractor may secure such employees from any other sources available. The Contractor shall notify the Union immediately when such employees are hired."

The above paragraph presupposes at least three distinct steps in the employment of union members: requisition by the contractor, furnishing by the union, and hiring by the contractor. The reasonable purport of this paragraph is that a contract of employment results not from the first two steps alone, but from a separate act of hiring in addition. The distinction between the referral of members by the union and the hiring of them by the contractor is clear also from paragraph B of Article XI, which provides:

"Unions may furnish forms when referring employees for hiring, such forms providing space for the Contractors to complete by checking reason for termination of the employees bearing the form."

None of the other provisions of the Master Agreement offers any guide on the issue of the time of commencement of employment. It is significant, however, that although the Agreement in paragraph A of Article XI, which is headed "Unjust Discharge," permits the contractor to "discharge any employee for any cause which he may deem sufficient," with limited exceptions, there is no provision which in any way restricts the contractor from refusing to hire a particular member referred by the union.

There is some dispute over the significance of paragraph 23(b), Section 1, of Appendix A to the Master Agreement, which provides that "transportation and travel allowance in each instance is to be paid for initial travel to a job with the employee's first pay check." It is clear, as noted on the reverse side of the work clearance slip, that petitioner would have been entitled to a transportation and travel allowance for his initial travel if he had arrived at the jobsite and performed work. Petitioner urges that the above-quoted paragraph implies that he was an employee of Merritt-Chapman's during the course of such travel. Merritt-Chapman argues that its liability for travel allowance does not accrue until the hiring takes place at the jobsite. At the hearing the personnel director of Merritt-Chapman testified that although his company would not pay such travel allowance to a member who was referred by the Union but was refused employment by Merritt-Chapman, it would make payment under protest to the Union.

We need not here decide whether Merritt-Chapman is obligated under the Master Agreement to pay a travel allowance to petitioner. The imposition of such liability does not necessarily imply that petitioner was an employee of Merritt-Chapman during the period of travel. If the referred

union member and the contractor are not contractually committed to an employment until a contract of hire is entered into at the jobsite, the obligation of the contractor under the Master Agreement to compensate the union member for his transportation expenses does not by itself accelerate the time of commencement of employment or create a contract of hire where one is otherwise not intended by the parties.

The significant point is that the Master Agreement is a contract between the union and the contractor and does not even purport to be a contract of employment between the contractor and the individual union member. It establishes standards of wages and working conditions which apply to persons who are employed by the contractor but it does not originate the employment. In so far as the Master Agreement does deal with the time of commencement of employment, it recognizes that the act of hiring by the contractor is a distinct act which takes place at a time subsequent to the union's referral of one of its members.

■ The evidence in the record, other than that which relates to the Master Agreement, does not require a reversal of the Commission's finding that no contract of hire was entered into between petitioner

and Merritt-Chapman. Petitioner testified that he had intended, prior to the accident, to work for Merritt-Chapman; Merritt-Chapman's personnel director, on the other hand, testified that petitioner was never placed on the company's payroll and, in effect, that if petitioner had arrived at the jobsite, he would have been interviewed in accordance with the regular procedure to determine whether he was a fit and suitable person for the position. None of this testimony was impeached or contradicted.

The Union dispatcher did testify, however, that he and not an official of Merritt-Chapman selected petitioner as the person to be referred to the company for the position of watchman; that on past occasions union members referred to a contractor under the Master Agreement sometimes failed to arrive at the jobsite or refused to work, particularly at the Glen Canyon Damsite, because they disliked the living facilities or for some other reason; that union members who are referred to the Glen Canyon Damsite are generally interviewed by a company official and are sometimes found to be unacceptable; and that the referred union member goes on the payroll of the contractor when he reports at the jobsite and turns in his work clearance slip, assuming that he and the employer want him to go to work.[1]

---

1. Upon cross-examination by the attorney for Merritt-Chapman, the Union dispatcher testified, in part, as follows:

"Q. You often refer members of your union from various labor offices to various construction jobs in Arizona, do you not? A. That is right.

This testimony of the Union dispatcher certainly warrants the conclusion that under the requisition procedure adopted by the Union and Merritt-Chapman, neither the referred Union member nor the company considers himself or itself bound to an employment until some time after the member arrives at the jobsite. Under these circumstances, no contract of employment can result prior to the Union member's arrival at the jobsite. Petitioner's intention to work for Merritt-Chapman is not inconsistent with an understanding on his part that neither he nor the company is committed to an employment during the time of initial travel.

A holding that a contract of hire is entered into prior to the time the referred union member arrives at the jobsite has at least three legal consequences which clearly appear not intended by any of the parties: (1) the interview customarily conducted by the employer at the jobsite would have no legal efficacy; (2) the failure or refusal of the union member to commence work would constitute a breach of the contract of hire; and (3) the refusal of the employer to hire the union member might violate the provisions of the Master Agreement relating to unjust discharge. Further, a holding that there is a contract of hire which either party can revoke at will at any time prior to the parties' agreeing to an employment at the jobsite finds no support in the evidence and, indeed, results in characterizing as a contract that which

"Q. And sometimes the men that are sent out don't get to the job, isn't that true? A. That is right.

"Q. And sometimes they get there and they don't like the looks of it and turn around and come back, isn't that true? A. Yes.

"Q. Talking of Glen Canyon particularly, some men don't like the living facilities or for some other reason they don't like to stay there? A. Yes.

"Q. And that is true of all construction jobs, is it not? A. Yes.

"Q. And when a man is referred to Glen Canyon Project or any other project, he goes there on your referral and looks the job over and is interviewed by the personnel director or other employment officer of the employer, is he not, generally? A. Yes.

"Q. And it sometimes happens that the employee for some reason is not acceptable to the employer, that happens, does it not? A. Yes.

"Q. He might have been a former discharged employee, for some reason they don't want that particular man, that sometimes happens, does it not? A. No, not in this particular case, it wouldn't.

"Q. In this particular case, but it has happened, has it not? A. Yes.

"Q. And the man, after he gets to the job, he looks over the job and first sees whether he wants to go to work and then the employer looks him over and sees that he wants to employ him, and if he is employed, then he goes on the payroll, is that correct? A. No, that isn't correct.

"Q. When does he go on the payroll? A. He doesn't select him, we don't keep a waiting list on the way, the man goes on the payroll as soon as he reports and turns in his clearance.

"Q. At the job site? A. Yes.

"Q. Assuming he wants to go to work? A. Yes.

"Q. And assuming the employer wants him to go to work? A. Yes."

grants no legal rights to either party and imposes no correlative duties on the other.

We recognize that there are situations in which a contractor or other employer may expressly or, through custom or usage, impliedly delegate to a union official the responsibility and authority for selecting and hiring a person required by the employer to fill a work classification covered by a collective bargaining agreement, and that the oral acceptance of that classification by the person selected by the union official will result in a contract of employment. See Bowers v. American Bridge Co., 43 N.J.Super. 48, 127 A.2d 580, affirmed on opinion below, 24 N.J. 390, 132 A.2d 28 and Gomez v. Federal Stevedoring Co., 5 N.J.Super. 100, 68 A.2d 482, principally relied on by petitioner, where an intermediate appellate court in each case dealt with the conflicts of law problem of which one of two states was the situs of a contract of employment and did not—because it was there conceded that the contract of employment had been entered into prior to the time claimant sustained the injuries which, also concededly, arose out of and in the course of that employment—determine the point here in issue. In those situations the result depends upon a finding that the employer, at the time he made his requirement known to the union official, committed himself to employ the person selected by the union official, and that the person so selected likewise committed himself to such employment. Where, however, as here, there are no such commitments by the employer and the prospective employee, it is held that there is no contract of employment, even for the purposes of a workmen's compensation or analogous statute. See Miller v. T. H. Browning S.S. Co., D.C., 73 F.Supp. 185, affirmed 2 Cir., 165 F.2d 209, certiorari denied 334 U.S. 834, 68 S.Ct. 1341, 92 L.Ed. 1761; Hunt v. Jeffries, 236 Mo. App. 476, 156 S.W.2d 23; Brewer v. Department of Labor & Industries, 143 Wash. 49, 254 P. 831; California Highway Commission v. Industrial Accident Commission, 40 Cal.App. 465, 181 P. 112.

We hold that there is competent evidence in the record to support the finding of the Commission that at the time petitioner sustained his injuries he was not under a contract of hire, either express or implied, with Merritt-Chapman and that he is, accordingly, not entitled to workmen's compensation. This holding makes it unnecessary for us to consider the other assignments of error.

The award is affirmed.

PHELPS and UDALL, JJ., concurring.

STRUCKMEYER, Justice (concurring).

The solution to the problem raised by the appeal lies in the application of simple, fundamental principles of law. The employer here, by written agreement, made the Union its agent to furnish potential

workmen. The sentence, "The Contractor shall notify the Union immediately when such employees are hired" (Paragraph B, Article II, Master Agreement), clearly imports that workmen furnished by the Union are not employees until accepted at the job site. The same conclusion is forced by paragraph B, Article IX, Master Agreement, providing that "Unions may furnish forms when referring employees for hiring * * *." (Emphasis supplied.) Posey simply was not hired as an employee until accepted at the job site.

The further question then is: what effect must be given the arrangement ("Special Working Rules", Appendix A, Master Agreement) for travel allowance and transportation to be paid to the potential employee for going from Phoenix, Arizona, to the job site in order to present himself for hiring? The answer to this question is plain and wholly dispositive of the case. The offer of Merritt-Chapman & Scott to compensate workmen for travel to the job site is not in itself a contract and cannot be raised to the dignity of a unilateral contract until acceptance by substantial performance. 1, Corbin on Contracts, 144, § 49. Posey never reached the job site nor presented himself for hiring, and hence, in my opinion, under no possible consideration of the law and the facts could it be found that Merritt-Chapman & Scott was contractually obligated to him.

However, if it be assumed that performance by Posey was substantial and therefore sufficient to create a firm obligation to pay him travel allowance and transportation, there is still to be faced the insurmountable hurdle that the contract is not one for employment—that is, one which creates the status of master and servant.

"Contracts for the rendition of services ordinarily result in one of three general classifications—such contracts may create a partnership, that of an independent contractor, or that of master and servant * * *. By considering the elements of these three general classifications, we eliminate those that do not fit the facts and thus determine the correct relationship created by the contracts." United States v. Wholesale Oil Co., 10 Cir., 154 F.2d 745, 747.

A.R.S. §§ 23–902, subd. C of the Workmen's Compensation Act provides:

"A person engaged in work for another, and who while so engaged is independent of the employer in the execution of the work and not subject to the rule or control of the person for whom the work is done, but is engaged only in the performance of a definite job or piece of work, and is subordinate to the employer only in effecting a result in accordance with the employer's design, is an independent contractor * * *."

This section has been construed numerous times. The test has been held to be whether the alleged employer retains control over the method of reaching the required result or whether his control is limited to the result reached, leaving the method to the other party. Barker v. General Petroleum Corp., 72 Ariz. 187, 232 P.2d 390, modified 72 Ariz. 238, 233 P.2d 449; Industrial Commission v. Navajo County, 64 Ariz. 172, 167 P.2d 113; Industrial Commission v. Byrne, 62 Ariz. 132, 155 P.2d 784.

Workmen leaving Phoenix to present themselves at the job site for hiring were not in any way under the control of Merritt-Chapman & Scott. No control was exercised over either the manner or the method by which they reached the job site. They were at liberty to travel by airplane, bus, automobile or other means of conveyance, and by any route, direct or circuitous.

I am of the opinion that the award of the Industrial Commission must be affirmed.

JOHNSON, Justice.

I dissent.

To fully understand the factual situation with which this Court is confronted, a few maxims and statements of policy are in order. In workmen's compensation cases, the burden admittedly lies with the claimant to bring himself within the statutory coverage. McGill v. Industrial Commission, 82 Ariz. 36, 307 P.2d 1042. In order to meet this burden, the claimant must prove a contractual relationship with the alleged employer. Ferrell v. Industrial Commission of Arizona, 79 Ariz. 278, 288 P.2d 492. And while it is true that basic contract law should be applied, it is equally true that "contract in labor law is a term the implications of which must be determined from the connection in which it appears." Shipley v. Pittsburgh & L. E. R. Co., D.C.W.D. Pa.1949, 83 F.Supp. 722, 740; J. I. Case Co. v. National Labor R. Board, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762.

In view of the apparent approach adopted by the majority in this case, a restatement of the basic philosophy of workmen's compensation is in order. The main elements thereof have been well-stated as follows: that (a) employers and employees in industry are engaged in a common venture for the furnishing of goods or services to society, anticipating profits or wages, as the case may be, as a reward; (b) their relationship is not solely one created by simple contract with each other, but amounts to a kind of industrial status; (c) the risk of injury and financial burden resulting therefrom should be borne by industry as a whole rather than fall solely upon the employee involved; and (d) the burden of the wearing out and destruction of human, as well as inanimate machinery, should be borne by industry just as other costs of production are assumed by the employer

and ultimately passed on to the public; it is in effect a special tax and a part of the operating expense, just as truly as any other cost of repair or operation; the industry as a whole is subject to the same hazard, and no unequal burden is placed upon a particular employer's establishment. Hanna, The Law of Employee Injuries and Workmen's Compensation, Vol. 2, p. 15. Because of the manifest public policy inherent in workmen's compensation acts, the courts will not adopt a rule which would defeat this public policy and render the purposes of the acts nugatory, in the absence of compelling language therein. Marshall v. Industrial Commission, 62 Ariz. 230, 156 P.2d 729. While it is settled that the Arizona Act is not intended to provide unemployment benefits or general insurance against all injuries, Matlock v. Industrial Commission, 70 Ariz. 25, 215 P.2d 612, it must be borne in mind that the act is remedial and its terms should be given a liberal construction with the view of effectuating their evident purpose of placing the burden of injury and death upon industry. Nicholson v. Industrial Commission, 76 Ariz. 105, 259 P.2d 547. Furthermore, where the issue is whether the requisite employee-employer relationship existed at the time of the claimant's injury, in the interests of justice and to carry out the humane purposes of the compensation act, all reasonable doubts should be resolved in favor of the claimant, Livingston v. State Industrial Accident Commission, 200 Or. 468, 266 P.2d 684, and the rule of liberal construction precludes the use of technical and narrow tests to determine the existence of this relationship. Aleckson v. Kennedy Motor Sales Co., 238 Minn. 110, 55 N.W.2d 696. What should be understood is that the question of a contractual status must be approached under workmen's compensation philosophy, and not that of master and servant, or principal and agent in tort actions. The workmen's compensation approach is broader and uses a more liberal construction favoring the employee. Black Mountain Corporation v. Stewart, 272 Ky. 140, 113 S.W.2d 1141. Plainly stated, the purpose of a workmen's compensation statute is to include employees and not to exclude them. Holland v. Georgia Hardwood Lumber Co., 214 S.C. 195, 51 S.E.2d 744. Where it has been possible to do so, without violence to either logic or the language of the statute, there has been an evolutionary process of liberalism in decisions affecting injured workers to meet the beneficent purpose of the Act. Burns v. Merritt Engineering Co., 302 N.Y. 131, 96 N.E.2d 739. See also, Scott v. Willis, 150 Va. 260, 142 S.E. 400; Richardson v. J. Neils Lumber Company, Mont., 341 P.2d 900.

The question in this case is one of status: was petitioner, at the time of his injury, an employee of Merritt-Chapman for the purposes of workmen's compensation? Any consideration of this problem must

involve the realization that in addition to the immediate parties, the State of Arizona has a vital interest in the outcome of the litigation. Therefore, although the general rule prevails that contract principles must be invoked to determine this status, the approach is not grounded in strict contract law but in the spirit of the workmen's compensation statute. The practical result of the majority decision clearly contravenes the manifest social objective of the statute; the question is whether this result is necessitated by law.

The first issue is whether the order placed by Merritt-Chapman with the Union for a watchman constituted an offer on the terms and conditions set forth in the Master Agreement. The majority discussion in this regard of paragraph B, Article II and paragraph B, Article XI of the Master Agreement, is of course not in point. Whether there could have been a contract prior to petitioner's arrival at the jobsite presupposes the acceptance issue and has no bearing on the question whether an offer of employment was made in the first instance. A complete analysis of the offer problem entails a thorough appreciation of the legal efficacy attaching to the collective bargaining agreement. The Supreme Court of the United States in J. I. Case Co. v. National Labor R. Board, supra [321 U.S. 332, 64 S.Ct. 579], said:

"Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. * * *

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, * * is free to select those he will employ or discharge. But the terms of the employment already have been traded out. *There is little left to individual agreement except the act of hiring.* This hiring may be by writing or by word of mouth or may be implied from conduct. In the sense of contracts of hiring, individual contracts between the employer and employee are not forbidden, but indeed are necessitated by the collective bargaining procedure.

"But, however engaged, an employee becomes entitled by virtue of the Labor

Relations Act somewhat as a third party beneficiary to all benefits of the collective trade agreement, even if on his own he would yield to less favorable terms. The individual hiring contract is subsidiary to the terms of the trade agreement and may not waive any of its benefits, any more than a shipper can contract away the benefit of filed tariffs, the insurer the benefit of standard provisions, or the utility customer the benefit of legally established rates.

\* \* \* \* \* \*

"Care has been taken in the opinions of the Court to reserve a field for the individual contract, even in industries covered by the National Labor Relations Act [29 U.S.C.A. § 151 et seq.], not merely as an act or evidence of hiring, but also in the sense of a completely individually bargained contract setting out terms of employment, because there are circumstances in which it may legally be used, in fact, in which there is no alternative. Without limiting the possibilities, instances such as the following will occur: Men may continue work after a collective agreement expires and, despite negotiation in good faith, the negotiation may be deadlocked or delayed; in the interim express or implied individual agreements may be held to govern. The conditions for collective bargaining may not exist; thus a majority of the employees may refuse to join a union or to agree upon or designate bargaining representatives, or the majority may not be demonstrable by the means prescribed by the statute, or a previously existent majority may have been lost without unlawful interference by the employer and no new majority have been formed. As the employer in these circumstances may be under no legal obligation to bargain collectively, he may be free to enter into individual contracts.

\* \* \* \* \* \*

"It is equally clear since the collective trade agreement is to serve the purpose contemplated by the Act, the individual contract cannot be effective as a waiver of any benefit to which the employee otherwise would be entitled under the trade agreement. The very purpose of providing by statute for the collective agreement is to supersede the terms of separate agreements of employees with terms which reflect the strength and bargaining power and serve the welfare of the group. Its benefits and advantages are open to every employee of the represented unit, whatever the type of terms of his pre-existing contract of employment.

"But is it urged that some employees may lose by the collective agreement, that an individual workman may some-

times have, or be capable of getting, better terms than those obtainable by the group and that his freedom of contract must be respected on that account. We are not called upon to say that under no circumstances can an individual enforce an agreement more advantageous than a collective agreement, but we find the mere possibility that such agreements might be made no ground for holding generally that individual contracts may survive or surmount collective ones. The practice and philosophy of collective bargaining looks with suspicion on such individual advantages. Of course, where there is great variation in circumstances of employment or capacity of employees, it is possible for the collective bargain to prescribe only minimum rates or maximum hours or expressly to leave certain areas open to individual bargaining. But except as so provided, advantages to individuals may prove as disruptive of industrial peace as disadvantages. They are a fruitful way of interfering with organization and choice of representatives; increased compensation, if individually deserved, is often earned at the cost of breaking down some other standard thought to be for the welfare of the group, and always creates the suspicion of being paid at the long-range expense of the group as a whole.

Such discriminations not infrequently amount to unfair labor practices. * * *" (Emphasis supplied.)

That the collective bargaining agreement sharply delimits the right of the employer and union member to negotiate an individual contract of employment, Christiansen v. Local 680 of M. D. and D. Employees, 126 N.J.Eq. 508, 10 A.2d 168, has been well-expressed in Moen v. Director of Division of Employment Security, 324 Mass. 246, 85 N.E.2d 779, 781, 8 A.L.R.2d 429, as follows:

"It is apparent that the union had been designated, in accordance with the provisions of the National Labor Relations Act, as the exclusive representative for all of the company's employees 'for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment.' * * * *The right of the claimant to deal with the company with respect to these matters was surrendered to the union.* The union had become the exclusive representative of all the employees of the company for the purposes of collective bargaining. (Citing cases.) The claimant was bound by the agreement made on his behalf by the union to the same extent as though he had entered into it individually. He is entitled to its benefits and must accept its burdens. * * *"

In summary, from Association of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp., 3 Cir., 1954, 210 F.2d 623, 630; 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510:

"* * * we hold that the employer's duty to pay a certain rate arises out of the collective bargaining contract plus the sanctions of the labor relations Act. The duty to pay a particular employee wages in the sum resulting from such rate arises out of the individual contract of hire. * * *"

With respect to the collective bargaining agreement, the majority opinion has this to say:

"The significant point is that the Master Agreement is a contract between the union and the contractor and does not even purport to be a contract of employment between the contractor and the individual union member. It establishes standards of wages and working conditions which apply to persons who are employed by the contractor but it does not originate the employment. In so far as the Master Agreement does deal with the time of commencement of employment, it recognizes that the act of hiring by the contractor is a distinct act which takes place at a time subsequent to the union's referral of one of its members."

The materiality of the quoted paragraph relates solely to the question whether a valid offer of employment is so conditioned by its terms that it can only be accepted at the jobsite. The paragraph, however, is quite irrelevant to the issue whether an offer of employment was made in the first place. The answer, clearly, is that when Merritt-Chapman sought requisition of a workman by its order placed with the Union dispatcher, it was bound to include in any contract made with the employee dispatched, terms and conditions of employment set forth in the basic contract between the employer on the one hand, and the union on the other. The terms and conditions of a contract of employment being thus established, there is little left to negotiate or to the individual agreement except the act of hiring J. I. Case Co. v. National Labor R. Board, supra, and the conditions, if any, which must be met before a formal contract of hiring is consummated and which would render the offer a mere pending proposition with condition attached, Hunt v. Jeffries, 236 Mo.App. 476, 156 S.W.2d 23, go to the requirements of a binding acceptance and certainly do not convert an offer of employment into a bare invitation to negotiate. In the following cases, on facts basically similar to those at bar, an offer of employment was assumed without controversy or further discussion: Hunt v. Jeffries, supra; Bowers v. American Bridge Co., 43 N.J.Super. 48, 127 A.2d 580; Gomez v. Federal Stevedoring Co., 5 N.J.Super. 100, 68 A.2d 482;

cf. Daggett v. Kansas City Structural Steel Co., 334 Mo. 207, 65 S.W.2d 1036. Furthermore, the mere fact that Merritt-Chapman did not communicate its offer directly to petitioner is wholly immaterial: by its agreement made with the Union, Merritt-Chapman abdicated its right of initial selection and delegated that right to the union; and in such circumstances, it is held that the dispatcher is the agent of the contractor for the purpose of communicating offers of employment to union members. Bowers v. American Bridge Co., supra; Raiche v. Standard Oil Co., 8 Cir., 1943, 137 F.2d 446, cf. Daggett v. Kansas City Structural Steel Co., supra.

The real question in this case is whether at any time prior to his accident, petitioner manifested asset to Merritt-Chapman's offer sufficient to effect a contractual status for purposes of workmen's compensation en route to the jobsite. And it is at this juncture that the majority essays an illiberal approach to the contract issue utterly discordant with the spirit of the statute. I accept the majority's position that until petitioner arrived at the jobsite and successfully negotiated the formal hiring procedures, if any, utilized by Merritt-Chapman, no formal contract of hire existed between the parties; and I will add that as a consequence, petitioner was not entitled to the benefits of the various provisions of the Master Agreement as to Merritt-Chapman, except the right to the stipulated travel time allowance. I vigorously dissent, however, from the failure of the majority to draw the vital distinction between a contract of hire for purposes of the contractual provisions in the Master Agreement, and a contract of hire for purposes of the workmen's compensation statute. The obvious reason for the distinction is that *the right to receive injury compensation is a right created by the statute alone and not at all by the Agreement,* the latter for this purpose being merely one method of determining the requisite status. The issue, then, whether petitioner manifested acceptance of the offer, is to be resolved under the statute and not under the Agreement. The Agreement indicates the requisites of acceptance; the statute does not. While the statute compels the application of basic contract law, the application must be made the term "contract" in labor law is a term in the realization, as aforementioned, that the implications of which must be determined from the connection in which it appears. J. I. Case Co. v. National Labor R. Board, supra. One might say for what "purpose" is the term to be considered. As an example of the principle in practice, it is useful to reflect upon a line of cases which have arisen under the Federal Arbitration Act, 9 U.S.C.A. § 1 et seq. This Act provides for enforcement in federal courts of arbitration agreements made in certain kinds of transactions. Excluded from the scope of this mandate, however,

are "contracts of employment." The issue in these cases was whether a collective bargaining agreement, *for the purposes of the exception,* constituted a contract of employment. On this question of interpretation, the weight of the cases has been in the affirmative. See the excellent discussion and cases cited in 64 A.L.R.2d 1331.

Since this Court is not compelled to resolve the acceptance issue by the Master Agreement, it should not do so. The results of so doing are harsh; the precedent established, appalling. The correct rule to be applied in these circumstances is that where the contractor constitutes another as its agent to make offers of employment, it thereby endows that agent with authority to receive on its behalf notice of acceptance. Bowers v. American Bridge Co., supra; Gomez v. Federal Stevedoring Co., supra; Daggett v. Kansas City Structural Steel Co., supra. In the instant case, nothing was shown in derogation of the authority of Harkness to dispatch, nor was it contended that Harkness was not the appropriate union official to dispatch. Therefore, when petitioner picked up his work clearance slip at the union office and thereafter embarked with dispatch for the damsite, pursuant to directions from Harkness, the union dispatcher, petitioner did thereby manifest his assent to the offer of employment for purposes of workmen's compensation. Bowers v. American Bridge Co., supra; Gomez v. Federal Stevedoring Co.,

supra; cf. Daggett v. Kansas City Structural Steel Co., supra. The offeree's assent to a proposed bargain may be shown by words or other acts to that effect. 17 C.J.S. Contracts § 45, p. 386; 1 Contracts A.L.I. Section 52.

The majority opinion, however, advances basically four reasons why a finding of a contract of hire on the facts at bar would be a terrible thing: (1) the interview customarily conducted by the employer at the jobsite would have no legal efficacy; (2) the failure or refusal of the union member to commence work would constitute a breach of the contract of hire; (3) the refusal of the employer to hire the union member might violate the provisions of the Master Agreement relating to unjust discharge; and (4) a holding that there is a contract of hire which either party can revoke at will at any time prior to the parties' agreeing to an employment at the jobsite finds no support in the evidence and, indeed, results in characterizing as a contract that which grants no legal rights to either party and imposes no correlative duties on the other. These ghosts are easily dispersed. To begin with, the contract of employment which I think is established for purposes of workmen's compensation, is not identical with the contract contemplated by the provisions of the Master Agreement, for reasons hereinbefore discussed. Meeting the majority upon its own ground, however, I must say that I certainly do not

agree that the "failure or refusal" of the union member to commence work could constitute a breach of contract, nor do I know of any principle of contract law that would be violated by a holding that this is a contract of hire which either party can revoke at will at any time. Consider the following, from Swart v. Huston, 154 Kan. 182, 117 P.2d 576, 579: .

> "One difficulty * * * [is] to find a good answer to the simple and obvious point that in the case at bar there was nothing in the collective bargaining agreement * * * which bound the plaintiff to work for defendant for any definite length of time. So far as the contract between plaintiff's union and defendant was concerned, plaintiff was privileged to quit whenever he should see fit. How then could it be held that defendant had no right to discharge plaintiff whenever he chose to do so and that he should be penalized for so doing? * * *"

And this, from Schlenk v. Lehigh Valley R. Co., 1 N.J. 131, 62 A.2d 380, 382:

> "* * * the matter of discipline * * * is, except insofar as otherwise agreed by contract, as exclusively for the determination of the employer as is the question of whether the employee wishes to continue to work is for him. * * *"

The Master Agreement in this case does not obligate either party to any contract of a definite term. The general rule must therefore apply, that there is no period fixed for the hirings and they are at the will of the parties, the employer having the right to discharge at any time and the employee having the right to quit. Yazoo & M. V. R. Co. v. Webb, 5 Cir., 1933, 64 F.2d 902; Werne, Law and Practice of the Labor Contract, Vol. 1, Section 9.01, p. 280. Furthermore, the Master Agreement, in paragraph A, Article XI, implicitly recognizes this general rule thusly:

> "The contractor may discharge any employee *for any cause which he may deem sufficient* * * *". (Emphasis supplied.)

The sole grounds constituting unjust discharge are specifically limited to the following, as set forth in the same paragraph of Article XI:

> "* * * *providing* there shall be no discrimination on the part of the Contractor against any employee nor shall any such employee be discharged by reason of any union activity not interfering with the proper performance of his work." (Emphasis supplied.)

Clearly, then, the majority's contention that the refusal of the employer to hire the union member might violate the provisions of the Master Agreement relating to unjust discharge, in the factual context in which it is advanced, is wholly without substance. Equally so, in view of the general

rule set forth above, is the idea that the interview customarily conducted by the Merritt-Chapman at its jobsite would have no legal efficacy. Assuming that petitioner was under a contractual relationship to Merritt-Chapman while en route to the jobsite, the latter was in no manner obligated at the jobsite to formally hire petitioner, but was free to reject him for any reason sufficient to itself, the only limitations on this power being those contained in paragraph A, Article XI of the Master Agreement.

Finally, the majority does in fact recognize, in its own language, that:

> "* * * there are situations in which a contractor or other employer may expressly or, through custom or usage, impliedly delegate to a union official the responsibility and authority for selecting and hiring a person required by the employer to fill a work classification covered by a collective bargaining agreement, and that the oral acceptance of that classification by the person selected by the union official will result in a contract of employment. * * *"

In an effort to distinguish the principal cases employing this rule from the facts at bar, Bowers v. American Bridge Co., supra, and Gomez v. Federal Stevedoring Co., supra, the majority holds that the results in those cases depended upon a finding that the employer, at the time he made his requirement known to the union official, committed himself to employ the person selected by the union official, and that the person so selected likewise committed himself to such employment. The "finding" thus stated is one made purely by this Court: neither of the cited cases offers even the foggiest support for such an assertion. In each case, actually, the union was simply requested to dispatch workmen to the jobsite in accordance with an established procedure nearly identical to that at bar. The opinions are absolutely barren of further references to hiring or hiring procedures even remotely sustaining the theory that the parties considered themselves bound in the matter prior to the arrival at the jobsite. In the New Jersey cases, the claimants reached the jobsite; in this case, petitioner did not: beyond this, the essential points of dissimilarity, according to the printed reports of the cases, cease. Indeed, the reported facts in the New Jersey cases are otherwise so substantially similar to those in the instant one, that the majority, in the interests of consistency, might very well make the same "finding" in the present matter as it has in the cited cases and hold for petitioner on that basis. In short, the point of distinction offered by the majority is, to say the least, unsatisfactory.

For reasons heretofore set forth, I would hold that petitioner, when he sustained his

injury, was contractually related to Merritt-Chapman for purposes of workmen's compensation.

Even though this contractual status existed, however, it was further incumbent upon petitioner before the Commission to show that the injury sustained arose out of and in the course of his employment. McCampbell v. Benevolent & Protective Order of Elks, 71 Ariz. 244, 226 P.2d 147. At the time of the accident, petitioner was en route to work. The general rule in this respect is that an injury suffered by an employee in going to and returning from work is not compensable. Serrano v. Industrial Commission, 75 Ariz. 326, 256 P. 2d 709; Strauss v. Industrial Commission, 73 Ariz. 285, 240 P.2d 550; Voehl v. Indemnity Ins. Co. of North America, 288 U.S. 162, 53 S.Ct. 380, 77 L.Ed. 676, 87 A.L.R. 245. A well-established exception however, has been engrafted upon this general rule, otherwise known as the "going and coming rule." The nature of the exception has been well-stated in Kobe v. Industrial Accident Commission, 35 Cal.2d 33, 215 P.2d 736, 737:

"* * * However, the employer may agree, either expressly or impliedly, that the relationship shall continue during the period of 'going and coming,' in which case the employee is entitled to the protection of the act during that period. Such an agreement may be inferred from the fact that the employer furnishes transportation to and from work as an incident of the employment. (Citing cases) It seems equally clear that such an agreement may also be inferred from the fact that the employer compensates the employee for the time consumed in traveling to and from work."

See also Larson's The Law of Workmen's Compensation, Vol. 1, p. 227, section 16.20, title, Payment for Time of Travel; and section 16.30, p. 229 under title, Payment for Expense of Travel, and cases cited thereunder on page 230 et seq.

The petitioner in this case was to receive one-half day's travel time plus transportation expense of $5.00. This arrangement was pursuant to provision in the Master Agreement, which in pertinent part is as follows:

"Appendix A—Laborers

"Laborers—Special Working Rules

"Section 1—General

"23. (a) Travel allowance and transportation for all employees covered by this Agreement shall be computed and paid for on the following basis:

"25 to 50 miles—Common carrier transportation

"50 to 150 miles—Common carrier transportation plus one-half (½) day's pay

264

"150 miles or more—Common carrier transportation plus one (1) day's pay

"However, where suitable transportation is furnished by the Contractor, travel allowance pay only shall be given.

"(b) Such transportation and travel allowance in each instance is to be paid for initial travel to a job with the employee's first pay check.

"(c) * * *

"(d) * * *

"(e) * * *

"(f) Whatever point an employee is paid travel allowance and transportation from at the beginning of the job, he shall be paid travel allowance and transportation back to that point at the end of the last pay period, provided the employee remains on the job until completion or discharge."

The amount of petitioner's one-half day's pay which he was to receive as a travel allowance presumably would be computed on the basis of his hourly wage as a watchman, as set forth in "Appendix A—Laborers—Section 1—General."

In Serrano v. Industrial Commission, supra, the claimant received one hour's pay daily as an allowance for travel and subsistence in going to and from the jobsite. Claimant sustained injury in an automobile accident during the trip from the jobsite to his home. We held, on the basis of the travel and subsistence payments, that claimant's employment commenced when he left his home, continued during the journey to the jobsite, and terminated with claimant's return to his home. We then concluded that the injury to the claimant resulted from an accident arising both out of and in the course of employment. Unless other considerations intervene, the present question must be decided under the authority of the Serrano case.

Merritt-Chapman, however, argues that the Serrano case is inapplicable to the facts at bar. It first urges as a point of differentiation that in the Serrano case the claimant was a regular employee of the contractor and had worked for it for some time before incurring the injury. This contention is without merit. The correct view, as expressed in Warren's Case, 326 Mass. 718, 97 N.E.2d 184, 186, is this:

"* * * We do not think that these cases can be distinguished from the present case by the fact that in them the employee had been employed on preceding days. Ordinarily an employee, in the course of each day, ceases for a considerable time to be 'in the course of his employment', although he has a general employment that requires work on subsequent days. When he returns to work at a later time or on a later day, we think that his status under the Workmen's Com-

pensation Act [M.G.L.A. c. 152 § 1 et seq.] is no better than it would have been if he were coming to work for the first time. In this case we think that the injury was properly found to have been suffered in the course of the employment after becoming an employee."

Merritt-Chapman's second, and more serious, objection is predicated upon an interpretation made with respect to the provisions of the Master Agreement appertaining to travel time and transportation allowances at a regular meeting of the State Joint Conference Board on November 30, 1956, pursuant to Article V(B) of the Master Agreement, as follows:

"The State Board interprets the various subcraft working rules pertaining to travel allowances and transportation, and the provisions of Article XIV, paragraph B regarding remote projects, as in no case providing payments for travel or subsistence expenses but, rather, as reimbursement for out-of-pocket expenses of the employee, and this interpretation is intended to eliminate any possible liability of the employee and/or employer that may be imposed by law."

Therefore, Merritt-Chapman urges, the foregoing interpretation of the Master Agreement embodies the express intent of the parties to such agreement, and clearly negatives any possibility of finding an implied intent that the time spent in such travel should be considered as part of the employee's working hours. Merritt-Chapman cites in support of its position Ebasco Services, Inc., v. Bajbek, 79 Ariz. 89, 284 P.2d 459, a case in which this Court held that a Joint Conference Committee interpretation similar to that set out above, effected a denial in application to the facts of the Serrano exception to the "going and coming rule" despite the fact that the claimant in that case was the recipient of a daily travel expense sum.

I do not understand how the Joint Conference Board interpretation in this case possibly can be accorded the legal efficacy sought by Merritt-Chapman. The Master Agreement is a contract between the contractor and the signatory unions. J. I. Case Co. v. National Labor R. Board, supra. Its provisions, until changed, therefore govern relations between the parties. The Joint Conference Board is established by paragraph B, Article V of the Master Agreement, and its various powers enumerated therein. The same paragraph, however, also limits the authority of the Board in the following language:

"It is understood and agreed that the Area Joint Labor-Management Committee and the Joint Conference Board shall not have authority to review any matters, either on motion of either

party or on its own motion, or make any recommendations which would *add to, alter, vary or modify any of the terms or provisions of this Agreement,* except the Joint Conference Board * * * may make the recommendations with respect to the use of classifications as provided in Article IV." (Emphasis supplied)

It should therefore be more than reasonably apparent that the power of the Joint Conference Board to interpret the meaning of any terms included in the Master Agreement, the basic contract, is strictly limited. When the Board attempts to say, as it does above, that the working rules pertaining to travel allowances and transportation shall in no case provide payments for travel or subsistence expenses but, rather, as reimbursement for out-of-pocket expenses, it not only alters, modifies, and varies plain terms in the Master Agreement; it disregards their obvious meaning altogether. Furthermore, as a sound principle of contract law, where the rights of respective parties are dependent upon a contract, unless that instrument is ambiguous, the intention of the parties must be determined by the words of the contract, unaided by testimony of the parties or judicial construction. Rock-Ola Mfg. Corp. v. Filben Mfg. Co., 8 Cir., 1948, 168 F.2d 919; New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.2d 1329. In Food Fair Stores, Inc. v. Raynor, 220 Md. 501, 154 A.2d 814, 821, it was held:

"The trial court did not err in refusing to accept the joint interpretation of the union and the company that Raynor was not entitled to truck driver's wages. Their agreement was integrated, and as to others with an interest in the agreement means what it says, not what the parties say they intended or what they subsequently agree it means. (Citing cases.) "

And union employees unquestionably have an "interest" in the Master Agreement. J. I. Case Co. v. National Labor R. Board, supra; Moen v. Director of Division of Employment Security, supra; Association of Westinghouse Salaried Emp. v. Westinghouse Elec. Corp., supra; Lewis v. Quality Coal Corporation, 7 Cir., 1959, 270 F.2d 140; Law and Practice of the Labor Contract, Werne, Vol. 1, Section 2.11, p. 98.

If we assume, *arguendo,* that the Joint Conference Board did have the authority to so interpret the plain language of the Master Agreement, the result must be the same. As we held in the Serrano case, supra [75 Ariz. 326, 256 P.2d 711]:

"It will be observed that the order of the Construction Industry Stabilization Commission did not fix one hour

as a definite limit of time to go to and from work so that the injury must have occurred within any nine-hour period. What the board actually did was to fix an amount of travel pay 'equal to one hour's pay' at such employee's straight time rate for each day worked by such employee. *That amount was as much a part of his daily wage as the $1.77 he received per hour while actually working on the job."* (Emphasis supplied.)

In that case it was determined that the effect of the employer allowing travel expense brought the employee within an exception to the "going and coming rule," and extended to the employee the benefits of the statute. The Serrano holding thus extended the *status* of employer-employee to cover the journey both to and from work where the employee was being compensated for the expenses incidental thereto, especially so where the amount of compensation is based upon the employee's particular wage. The financial arrangement at bar is in all material respects identical to that involved in Serrano. It therefore must follow that the *status* of the relationship being established in this case by virtue of the direct authority of the Serrano decision, no contract, express or implied, made within or without the State of Arizona, unless expressly so authorized by law, can of itself affect the rights and duties flowing from such status. The workmen's compensation statute is mandatory on both employer and employee and may not be waived or contracted away. The Ocean Accident & Guarantee Corporation, Limited v. Industrial Commission of Arizona, 32 Ariz. 275, 257 P. 644; Industrial Commission v. Meddock, 65 Ariz. 324, 180 P.2d 580; Industrial Commission of Arizona v. J. & J. Const. Co., 72 Ariz. 139, 231 P.2d 762. The purpose of the workmen's compensation statute is to protect workmen from economic loss due to injuries attributable to employment, Emery v. Industrial Commission, 69 Ariz. 87, 210 P.2d 217, and thus lift that burden from the shoulders of relatives, friends and the public. Vukovich v. Ossic, 50 Ariz. 194, 70 P.2d 324. And courts do not countenance ingenious contrivances to circumvent or avoid the beneficent provisions of the workmen's compensation law. Industrial Commission v. Meddock, supra.

Insofar as it seeks to negative the existence of an employer-employee status at the time of petitioner's accident and thus relieve industry of the burden it rightfully should assume under our decision in Serrano v. Industrial Commission, supra, thus confounding the announced public policy of the Arizona Workmen's Compensation Act, the interpretation of the Joint Conference Board of the travel time provisions in the Master Agreement, should be declared a nullity.

268

Furthermore, to the extent that it conflicts with this rationale, Ebasco Services, Inc. v. Bajbek, supra, should be expressly overruled and the dissent therein approved.

The award should be set aside.