[Civ. No. 27824.   Second Dist., Div. Three.   April 14, 1964.]

CHICAGO BRIDGE & IRON COMPANY, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and CLYDE D. COPLIN, Respondents.

Lawler, Felix & Hall, Kenneth B. Wright and Douglas Van Dyke for Petitioner.

E. Herbert Herlihy and F. George Herlihy as Amici Curiae on behalf of Petitioner.

Everett A. Corten, Edward A. Sarkisian, Silver, McWilliams & Sherman and Richard L. McWilliams for Respondents.

FORD, J.—The sole question presented in this matter is whether the commission erred in its determination that the contract of hire pursuant to which the respondent Clyde D. Coplin worked for the petitioner Chicago Bridge & Iron Company was made in California and that, accordingly, the commission had jurisdiction with respect to an injury to Mr. Coplin which occurred in Nevada.[1]

The articles of agreement between the union to which Mr. Coplin belonged and the signatory employers, including the petitioner Chicago Bridge & Iron Company, covered field construction work in California and Nevada, as well as in other designated states. It was therein provided in part as follows: "All applicants for employment shall be required to furnish the Contractor satisfactory evidence in writing of their qualifications and skill from any source that is recognized as a proper source by the Contractor, not limited to the Union, and such evidence shall be kept by the Contractor. The Contractor shall have the right to reject any applicant for employment who is unable to thus establish his qualifications and skill necessary to perform the work required by the Contractor or for any other bona fide reason." In an appendix to the agreement it was stated: "The Contractor retains the right to reject any job applicant referred by the Union." Other rules contained provisions as to classifications and wage scales for employees and as to hours of work.

Provision was also made in the agreement for travel expense and subsistence where the job was located at a substantial distance from the city in which the local union having jurisdiction of the job was located. Part of the agreement with respect thereto was as follows: "It is the intention of the parties that employment commences and ends at the job site. In recognition of other travel costs incurred by the employee before commencement and after termination of his employment, Contractor agrees to supplement the transportation allowance provided ... above, by reimbursing eligible

---

[1]Section 5305 of the Labor Code is as follows: "The commission has jurisdiction over all controversies arising out of injuries suffered without the territorial limits of this State in those cases where the injured employee is a resident of this State at the time of the injury and the contract of hire was made in this State. Any such employee or his dependents shall be entitled to the compensation or death benefits provided by this division."

employees at the rate of fourteen cents (14¢) per mile between such city hall and the job site for such expenses incurred prior to and after termination of their employment."

With respect to union representation at the place of work it was provided in part as follows: "A steward shall be a working journeyman who shall, in addition to his work as a journeyman, be permitted to perform during working hours such of his union duties as cannot be performed at other times. ... The union shall notify the Contractor of the name of the steward. It is recognized by the Contractor that it is desirable that the person named as steward shall remain on the job as long as there is work which he is capable of performing."

In determining whether there is sufficient support in the record for the finding that the injury was sustained by Mr. Coplin "while performing service under a contract of hire entered into within the State of California," this court is governed by the law concisely stated in *Gonzales* v. *Industrial Acc. Com.*, 50 Cal.2d 360, at page 364 [325 P.2d 993], as follows: "Findings of the Industrial Accident Commission are not subject to review on the ground that there is no substantial evidence to sustain them, except insofar as it may appear that they have been made without any evidence whatever in their support. (*Douglas Aircraft, Inc.* v. *Industrial Acc. Com.*, 47 Cal.2d 903, 905 ▪ [306 P.2d 425].)" The evidence which lends support to the commission's finding will be stated.

H. W. Gillespie testified that he was business representative for the Boilermakers' Union for the area of San Bernardino and Riverside Counties in California and three southern counties in Nevada. He described his duties as being "to dispatch men, control jobs, to handle jurisdictional disputes, and generally to service our men." The local union he represented had one hiring hall. That hall was in Los Angeles and was for the area of southern California and four southern counties of Nevada. In the latter part of 1961, Mr. Gillespie spoke to Mr. Turner, foreman for the Chicago Bridge & Iron Company, at the location of the work which that company was doing near Fontana, California. Mr. Turner was preparing to go to a job at Mercury, Nevada, and was going to take the crew which he had been using on the Fontana project. Mr. Gillespie further testified as follows: "Told him that I would send him a steward on the job, Mr. Coplin, who will be the steward in the Mercury, Nevada, job; and after he called

in and said he could use the man, he later called, if my opinion is right, and said there would be a week or so before he could use him on account of material and asked if they can have a temporary steward until he arrived at the job, and we stated yes. And we sent Mr. Coplin up—dispatched him out of the hall as steward on the job and a welder.'' At the time he spoke to Mr. Turner, the Nevada work had not commenced and there was no steward on the job. Mr. Turner told him ''nothing'' with reference to whether Mr. Coplin would be acceptable. At that time Mr. Gillespie indicated that he was sending Mr. Coplin; he was a welder qualified for the job and would be the steward. The actual work order or request did not come in until sometime after this conversation. On cross-examination, Mr. Gillespie testified that Mr. Turner raised no objection when he told him that he would send a welder, Mr. Coplin, to be the steward.

In later testimony, Mr. Gillespie said that the Chicago Bridge & Iron Company employed the services of Waggoner's Secretarial Service in Las Vegas, Nevada, in the processing of the necessary forms used to obtain clearances for its employees as required by the Atomic Energy Commission.

John Leckie testified that he was business representative for the Boilermakers' Union, Local 92, in Los Angeles. He received a telephone call on November 29, 1961, from Mr. Turner, foreman for Chicago Bridge & Iron Company, who was in Fontana, California. Mr. Leckie related the conversation as follows: ''Request to transfer, I don't remember how many men at that time, six or five, whatever it was; and I stated to him that would be fine, we would—a transfer would be issued, and we would put a steward on the job. Turner at that time told me, he said, well, that part was fine, we couldn't use him right now and would I hold for one week and would be glad for us to send him a steward; I said under those circumstances, because of material and that they couldn't use him. I said the man would be a welder named Clyde Coplin, who was our representative, representing the business agent on the job as a steward.'' Mr. Coplin was mentioned by name in that conversation and Mr. Leckie told Mr. Turner that Mr. Coplin would be the steward on the job. The work order was prepared the next day. Mr. Leckie further testified that ''it is customary on all jobs that we place a steward; they leave one opening.''

Mr. Coplin testified that he lived in Los Angeles. He went to the office of the local union about every day or every other

day in the period of time before December 7, 1961. Several days prior to that date Mr. Leckie told him that there had been a call about "that job in Nevada" to the effect that he should be there on December 11. On December 7 he received from Mr. Leckie a work order which designated the time at which he was to report for work as 8 a.m. on December 11, 1961. He traveled to Nevada in his own automobile and, after arriving there on or about December 9, a Saturday or Sunday, he reported to Waggoner's Secretarial Service in Las Vegas pursuant to the direction on the work order. He gave the woman there the record of his previous employment and information as to his previous places of residence. He understood that the purpose was to see if he was a security risk because of "the atomic energy." He received a clearance. On the day following his vist to the Waggoner office, he reported to Mr. Turner, the foreman for the Chicago Bridge & Iron Company, at the job site at Jackass Flats. He signed several forms, some of which, he testified, were probably forms for his employer and others probably government tax forms. Then he changed his clothes and went to work. His first assignment was to do welding work. He later received $66 or $68 from his employer for expenses in traveling to the job site in Mercury, Nevada.

James Turner testified that he was employed as foreman for Chicago Bridge & Iron Company at Mercury, Nevada, in the period during which Mr. Coplin worked there. The project commenced on December 4, 1961, and Mr. Turner was in charge for his company. All the men, other than Mr. Coplin, had worked on the previous job at Fontana, California. Mr. Turner testified that Mr. Gillespie informed him that Mr. Coplin would be sent to the job as steward. He had not requested that Mr. Coplin be sent and did not know him before he arrived. He believed that that conversation with Mr. Gillespie was not at Fontana, California, but that it took place on Mr. Gillespie's first visit to the job at Mercury, Nevada, during the first week in December. While he was at Fontana he did talk to Mr. Leckie on the telephone. His best recollection as to that conversation was that it was about the transfer of his whole crew from Fontana to Mercury, Nevada. He did not ask for additional men but was told that he had to hire one additional man as steward on the job. He did not recall whether Mr. Coplin's name was specifically mentioned, but he remembered that he told Mr. Leckie to hold off for one or two weeks. In response to inquiry as to the reason for

asking for the delay, Mr. Turner testified : ''Because I didn't need a man at that time getting the tools unpacked and getting the job set up. Also, I recall during this conversation that I said if you are going to send me a man, send me a chipper, that I had ample welders.'' Mr. Leckie said that the man he had for him could do anything. The week before Mr. Coplin arrived, Mr. Gillespie told Mr. Turner that Mr. Coplin would be on the job. He would not have hired any other man except for the union requirement that he hire one man who would act as the steward.

Mr. Turner testified that Waggoner's Secretarial Service was hired to do the paper work for his company with respect to clearing with the security agency of the Atomic Energy Commission any men who were going to work in Mercury, Nevada, at the test site. Without such clearance, a man could not work for his company.

Mr. Turner also testified that before Mr. Coplin arrived, the union had informed Mr. Turner that he was en route. When Mr. Coplin came to the job site, Mr. Turner had no discussion with him except that he went ''through the regular procedure of signing him up as an employee.'' In a small record book, notations were made as to matters such as his name and address, Social Security number, telephone number, prior employment by the company, date of birth, and previous injuries. In addition, a W-4 form relating to federal income taxation was filled out. Mr. Turner further testified that there was ''nothing else to do other than issue safety goggles and safety hats.'' As an indication of clearance by the Atomic Energy Commission, Mr. Coplin had a ''photo badge.''

There are a number of cases involving the question of jurisdiction over a claim for workmen's compensation where the offer of employment was addressed to a person in one state but the place of the performance of services was in another state. (*Standard Oil Co.* v. *Lyons*, 130 F.2d 965; *Miller Contracting Co. of Ohio* v. *Hutto* (Fla.) 156 So.2d 745; *Ray-Hof Agencies, Inc.* v. *Petersen* (Fla.) 123 So.2d 251; *Pearson* v. *Electric Service Co. of Pensacola*, 166 Kan. 300 [201 P.2d 643]; *Cobb* v. *International Paper Co.* (La.App.) 76 So.2d 460; *Hunt* v. *Jeffries*, 236 Mo. App. 476 [156 S.W.2d 23]; *Bowers* v. *American Bridge Co.*, 43 N.J.Super. 48 [127 A.2d 580]; *Gomez* v. *Federal Stevedoring Co.*, 5 N.J.Super. 100 [68 A.2d 482]; *Roan* v. *D. W. Falls, Inc.*, 72 N.M. 464 [384 P.2d 896]; *Warren* v. *Dixon & Christopher Co.*, 252 N.C. 534 [114

S.E.2d 250]; *Foster Wheeler Corp.* v. *Bennett* (Okla.) 354 P.2d 764; see also *Posey* v. *Industrial Com.,* 87 Ariz. 245 [350 P.2d 659].) But each of those cases involved facts substantially different from the facts upon which the present case is based.

In this case, there was no offer of employment which originated with the employer, Chicago Bridge & Iron Company. Mr. Leckie testified that in the course of a telephone conversation with Mr. Turner on November 29, 1961, concerning the transfer of Mr. Turner's crew from a job at Fontana, California, to the new work in Nevada, he informed Mr. Turner that the transfer would be satisfactory but that an additional man would be sent to the Nevada job site to act as steward. Mr. Leckie said that the additional man would be a welder, Clyde Coplin. Mr. Turner agreed to that arrangement but asked that the new man not be sent for a week. That call was made by Mr. Turner in Fontana, California, to Mr. Leckie in Los Angeles, California. Mr. Turner testified that while he was at Fontana he talked to Mr. Leckie on the telephone about the transfer of his crew from Fontana to Mercury, Nevada. He did not ask for more men but was told that he had to hire one additional man for the job. While he did not recall that Mr. Coplin's name was specifically mentioned, he told Mr. Leckie that the man should be a chipper. Mr. Leckie replied that the man he had for him could do anything.

The testimony to which reference has just been made was sufficient to sustain a determination that Mr. Turner, acting on behalf of Chicago Bridge & Iron Company, agreed in California on November 29, 1961, to employ Mr. Coplin at Mercury, Nevada. It is true that Mr. Turner appears to have entered reluctantly into that agreement, but that fact did not detract from the legal effect of his assent. (See 1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 58, p. 64.)[2] In exchange for the promise which he had exacted from Mr. Turner on behalf of the union, Mr. Leckie promised to send to the job site in Nevada a qualified man, Mr. Coplin.

A contract with respect to employment may, of course, come into being prior to the time when the contemplated

---

[2] Witkin states: "A 'grumbling acceptance,' which is unqualified, though made with some protest, is sufficient. (*Purdy* v. *Buffums, Inc.* (1928) 95 Cal.App. 299 [272 P. 770].) Likewise, where the offeree accepts unequivocally, a contract results even though he requests or expresses a desire for some change in the terms. (Rest., Contracts, § 62.)"

services are to be rendered. (See *General Electric Co.* v. *Folsom* (Okla.) 332 P.2d 950, 952.) ██ Some point, however, is made of the fact that it was necessary for Mr. Coplin to receive a security clearance before he could commence his work. But it does not appear that Mr. Turner and Mr. Leckie intended that their agreement should only become effective upon or after the granting of such clearance. That clearance could be obtained without undue delay and was, of course, subject to being rescinded if further investigation warranted such action. The fact, however, of the existence of a condition that such clearance had to be obtained before employment would commence did not prevent the formation of a contract with respect to such employment at the time of the conversation between Mr. Turner and Mr. Leckie. (Cf. *Roan* v. *D. W. Falls, Inc., supra,* 72 N.M. 464 [384 P.2d 896]; *General Electric Co.* v. *Folsom, supra* (Okla.) 332 P.2d 950, 952; see 4 Corbin on Contracts, § 817.) The matter of Mr. Coplin's qualifications for the job had been resolved by the agreement reached on November 29, 1961, and that Mr. Turner so understood is evidenced by the manner in which he received Mr. Coplin and assigned him to work upon his arrival at the job site. ██ Moreover, the fact that incidental administrative matters were taken care of when Mr. Coplin reported to Mr. Turner in Nevada was consonant with the performance of a contract of hire already in existence. (See *Bowers* v. *American Bridge Co., supra,* 43 N.J. Super. 48 [127 A.2d 580, 584].)

The petitioner places emphasis upon the language of the agreement between the union and the signatory employers which was as follows: "It is the intention of the parties that employment commences and ends at the job site." It is to be noted, however, that the language is found in the portion of the agreement in which provision was made for the payment of travel expense and subsistence under certain circumstances. The use of the quoted language may have been for the purpose of seeking to avoid the implication which might otherwise arise by virtue of such payment that there was an agreement that the employment relationship should be in effect during the period of such travel. (See *Kobe* v. *Industrial Acc. Com.,* 35 Cal.2d 33, 35 [215 P.2d 736].)[3] ██ But, in

---

[3]In the *Kobe* case, the Supreme Court stated (35 Cal.2d, at p. 35): "It is the general rule that injuries sustained by an employee going to or returning from work are not compensable under the Workmen's Compensation Act. The rule is premised on the theory that ordinarily

any event, the fact that Mr. Coplin's duties did not commence and he did not enter the course of employment until he reached the job site could not detract from a determination that the contract for his hire was made at a prior time in California.

The union acted on its own behalf with respect to the designation of a stewart and on behalf of Mr. Coplin with respect to the procurement of employment for him. But it is not necessary to discuss the extent to which the union acted as the agent of Mr. Coplin. While the contract was not made directly by Mr. Coplin with the employer, it was clearly a contract for the benefit of Mr. Coplin. (See *Sublett* v. *Henry's etc. Lunch,* 21 Cal.2d 273, 275 [131 P.2d 369]; *Johnson* v. *Holmes Tuttle Lincoln-Mercury, Inc.,* 160 Cal. App.2d 290, 296 [325 P.2d 193].) As this court said in the *Johnson* case (160 Cal.App.2d, at p. 297): ''While the contract remains unrescinded, the relations of the parties are the same as though the promise had been made directly to the third party. Although the party for whose benefit the promise was made was not cognizant of it when made, it is, if adopted by him, deemed to have been made to him.'' Mr. Coplin, if he did not do so before, adopted the promise of employment when he accepted the work order and departed for Nevada. As to him it was a contract of hire and had the same legal consequences, insofar as the present matter is concerned, as though he had made it directly with the employer.

The contract was bilateral in nature since it was one in which there were mutual promises made on behalf of the respective parties by Mr. Turner and Mr. Leckie, each promise being given in consideration of the other. (See *Davis* v.

the employment relationship is suspended from the time the employee leaves his work to go home until he resumes his work. (*California Cas. Indem. Exch.* v. *Industrial Acc. Com.,* 21 Cal.2d 751, 754 [135 P.2d 158].) However, the employer may agree, either expressly or impliedly, that the relationship shall continue during the period of 'going and coming,' in which case the employee is entitled to the protection of the act during that period. Such an agreement may be inferred from the fact that the employer furnishes transportation to and from work as an incident of the employment. (*California Cas. Indem. Exch.* v. *Industrial Acc. Com.,* 21 Cal.2d 461 [132 P.2d 815]; *Trussless Roof Co.* v. *Industrial Acc. Com.,* 119 Cal.App. 91 [6 P.2d 254]; cf. *Breland* v. *Taylor Eng. etc. Co.,* 52 Cal.App.2d 415 [126 P.2d 455].) It seems equally clear that such an agreement may also be inferred from the fact that the employer compensates the employee for the time consumed in traveling to and from work.''

*Jacoby,* 1 Cal.2d 370, 378-379 [34 P.2d 1026]; 1 Witkin, Summary of Cal. Law (7th ed. 1960) Contracts, § 3, p. 15.)

Inasmuch as both Mr. Turner and Mr. Leckie were in California when that oral contract relating to the employment of Mr. Coplin was made, the commission did not err in its determination that it had jurisdiction with respect to Mr. Coplin's claim for workmen's compensation.

The award is affirmed.

Shinn, P. J., and Files, J., concurred.