EMILY ANFINSON v. A. O. U. W. INSURANCE COMPANY
AND ANOTHER.[1]

March 13, 1942.

No. 32,996.

*Gillette & Meagher,* for relators.
*F. P. Ryan* and *Thomas Gallagher,* for respondent.

GALLAGHER, CHIEF JUSTICE.

*Certiorari* to the industrial commission to review an order granting compensation for death.

Anton Anfinson, petitioner's husband, suffered a fatal accident on October 16, 1940, while sawing logs on a farm owned by relator A. O. U. W. Insurance Company. Presented for decision is the single question whether Anfinson at the time was engaged as an employe or an independent contractor.

The insurance company (hereinafter referred to as the lodge) employed Mr. S. J. Danskin to manage its farms in northern Minnesota, some 60 in number. The one on which the accident occurred was occupied during the determinative period by Everett Millam as tenant, who had cut saw logs for the lodge on another farm near the one he occupied. These logs were to be converted into lumber, half of which was to be Millam's as compensation for

[1]Reported in 3 N. W. (2d) 7.

his logging. Millam and the lodge were each to pay one-half the cost of converting them into lumber. The logs, estimated to have a lumber content in excess of 40,000 feet, were piled on the Millam farm.

Anfinson, a farmer in the neighborhood, owned a stationary sawmill with the appurtenant carriage. Early in 1940, Danskin engaged Anfinson to saw these logs at the Millam farm. Anfinson's sawmill was dismantled and moved by truck to the log pile. The agreement between Danskin and Anfinson was not only oral and informal but also indefinite. Anfinson, of course, being dead, could not give his version. But apparently Danskin informed Anfinson that the lodge and Millam owned "the logs on a 50-50 basis" and that they "would engage him [Anfinson] to do the work at * * * $5.00 a thousand," Millam and the lodge each to pay "half of it." It also appears that the three, Danskin, Millam, and Anfinson, understood that they were to get together later and reach a definite agreement, a meeting which, as it happened, never took place.

Anfinson began sawing in June 1940. After a week or so he shut down the mill, turning his attention to haying and other farm work which then pressed him. Work was resumed again in early October. During all of the work, Anfinson had the assistance of Millam, the latter's brother, and, for a good part of the time, that of one Molander. The evidence is that Millam separately agreed with Anfinson to furnish his tractor for motive power and to operate it himself. It may be that Millam was to furnish other help, but upon that the record is not clear. At any rate, he was to receive in return a credit of $2.50 per thousand, his share of the cost of converting the logs into lumber.

As the work progressed, Danskin wrote a series of letters to Anfinson which have an important bearing upon the relationship of the parties. On April 15, 1940, he wrote Anfinson:

"As soon as you have had a chance to scale the timber that you will be sawing on the farm rented by Mr. Millam, will you please send the figures into the Grand Lodge, and if it is so you can, will

you scale this by the different types of wood, giving the approximate number of board feet of pine, etc., of each different kind."

On at least two occasions during the course of the work Danskin inspected it and talked with Anfinson about it. On June 18, following one of these talks, he wrote Anfinson a letter, which we quote in full:

"Rehearsing the talk which we had Friday in regard to sawing the white oak lumber or timber, will say that all cuts should be 'full' or 'clear.'

"They can be cut either two-inch or one-inch on this basis to work down to a four-inch center on small logs and a six-inch center on large logs. These centers can be cut up for lumber use.

"We would appreciate it very much if each different kind of lumber were piled in separate piles as they come from the sawmill. The following lengths are also acceptable and these should be full lengths, if possible:—8 ft. quoted at one price; ten to twelve ft. quoted at another; and 14 to 16 ft. at still another price; with the highest price oak lumber at 18 ft. and over.

"Short pieces, four feet and longer, which are fourteen inches or wider and are one and a half inch material cut an inch and five-eighths, also bring a top price. This type is used in boat building, so you probably know about it."

On July 19, 1940, Danskin directed by letter that: "On the 50 pieces of 2 x 12s; they must be at least 13 feet in length, so it would be all right if they all run 14 feet, but anything under 13 feet would be to [too] short."

On September 21, 1940, Danskin wrote Anfinson the following letter:

"You will remember that our understanding was that you would work up as much two-inch lumber as possible, but the situation has now changed. We are going to use upwards of 15,000 feet of one-inch material on the H. B. Ranch. Please change the sawing to one-inch material of, I believe, eight-foot length, as much as possible. The lumber should be of such a type as could be

used for the board fencing of a sheep corral. I believe the man going on the place understands that elm could be included in this.

"Will you please inform us as to the approximate amount of the one-inch lumber you have on hand already sawed and how much more could be worked out for this purpose. Just make a rough estimate of it and let us have it just as soon as possible."

The determinative question is whether Anfinson was an independent contractor or an employe. He was the former rather than the latter unless, under the contract, the lodge had the right of control characteristic of the employer-employe relationship, *i. e.,* the right to control the manner and means of performance. Bolin v. Scheurer, 210 Minn. 15, 17, 297 N. W. 106; Wicklund v. North Star Timber Co. 205 Minn. 595, 287 N. W. 7. The commission's decision that Anfinson was an employe must stand if there is any reasonably sufficient evidence tending to support it. Schoewe v. Winona P. & G. Co. 155 Minn. 4, 191 N. W. 1009; Myers v. Villard Creamery Co. 189 Minn. 244, 248 N. W. 824. It is plain to us that there was such evidence.

The fact that Anfinson supplied his own sawmill is not of controlling significance. Lynch v. Hutchinson Produce Co. 169 Minn. 329, 331, 211 N. W. 313; Rouse v. Town of Bird Island, 169 Minn. 367, 368, 211 N. W. 327. Nor is the fact that he was paid on the basis of what he produced. State ex rel. Virginia & R. L. Co. v. District Court, 128 Minn. 43, 150 N. W. 211; Herron v. Coolsaet Bros. 158 Minn. 522, 525, 198 N. W. 134.

On the other hand, the very informality and indefiniteness of the agreement is some evidence of an employer-employe relationship, Bolin v. Scheurer, *supra,* since it is not likely, considering the value of the timber involved, that Anfinson would have been given the freedom of an independent contractor, responsible only as to result and not even bound as to that by any definite contract provisions. *Cf.* State ex rel. Virginia & R. L. Co. v. District Court, 128 Minn. 43, 150 N. W. 211.

. Moreover, we can find nothing in the record necessitating the conclusion that all the logs were to be converted into lumber. So

far as appears, Anfinson could have been discharged at any time; at least that was a fact question. This unrestricted right of discharge afforded adequate means for controlling Anfinson's work. Bolin v. Scheurer, 210 Minn. 15, 297 N. W. 106; Krause v. Bodin, 172 Minn. 467, 215 N. W. 838; Lynch v. Hutchinson Produce Co. 169 Minn. 329, 211 N. W. 313.

In addition, it appears that the lodge actually did control the details of operation, the manner and means of performance. Cf. Rouse v. Town of Bird Island, 169 Minn. 367, 211 N. W. 327. It must be remembered that manner and means as opposed to result "necessarily vary in kind and degree with each fact situation." Bolin v. Scheurer, 210 Minn. 15, 17, 297 N. W. 106, 107. In this case the result contracted for by the lodge was simply the conversion of the logs into lumber. Plainly, Anfinson was not permitted to accomplish this result unhampered. Danskin was on the job and looked over the work twice. The letters kept Anfinson informed as to just what he was supposed to do. He was instructed, for example, to scale the logs according to the type of wood and to saw the white oak timber so as to make all cuts "full" or "clear." He was instructed that the different kinds of lumber should be piled in separate piles. And he was given very extensive, detailed directions as to the dimensions desired. This apparently changed from time to time with the lodge's changing needs. These letters not only show an actual control of method, but they form a basis for inferring a right of further control if and when it should become necessary.

Petitioner is allowed $100 attorneys' fees in addition to statutory costs and disbursements.

Writ discharged and order affirmed.

STONE, JUSTICE (dissenting).

The determinative rule applied by the majority is well established. Stated another way, it is that when, under a contract, the right of control extends beyond result to the manner and means of accomplishing a result, independent contract vanishes and the relationship of employer and employe arises.

As recognized by the majority, manner and means, as opposed to result, "necessarily vary in kind and degree with each fact situation.". Thus, as a premise of logical decision, there must be clear determination of what is "result" and what are "manner and means." Obviously, the same act or process may be "manner and means" in one case and "result" in another, depending largely upon what the contract seeks to accomplish. For instance, if this contract had contemplated construction by Anfinson of a farmhouse from lumber cut from the log pile, a right in the lodge to dictate dimensions of the lumber and where it should be stored prior to use could well be control over "manner and means." But this contract was for "conversion of the logs into lumber," and the "result" was lumber—cut, sorted, and piled in a certain manner.

The important point is that Anfinson, from all that appears, was not concerned with dimensions of the lumber, because he was being paid according to the amount of lumber produced regardless of size or type. Admittedly, there was some difference in the effort required to produce various sizes and types. But the evidence requires belief that both Anfinson and Danskin realized, in view of the large amount of logs to be converted and the nature of the lodge's business, that as time went on the needs of the lodge would change. The only reasonable implication, borne out by all the evidence, is that within reasonable limits the lodge had the privilege of specifying the sizes and types desired. But how can it be said that this right was control over "manner and means" of producing the lumber?

At the outset, the "understanding" was that Anfinson would "work up as much two-inch lumber as possible." After part of the sawing had been done, the lodge asked that he "change the sawing to one-inch material of, I believe, eight-foot length, as much as possible." The lodge made various requests as to length desired. To a large extent this factor was determined by length of available logs. Beyond that, it seems to have made little difference to Anfinson whether the boards were to be 8 or 12 feet long.

These instructions, it is said for the majority, "show actual

control of method." Upon analysis, however, what were they but specifications of the type of result desired, just as though in a contract for painting houses the owner requests that the first be brown and later that the rest be white?

Similarly and for stronger reason, the requests for reports in the nature of an inventory of work done, and that the lumber be piled according to type of wood, were properly made under the contract and related solely to "result." As pointed out above, it might be otherwise under an agreement contemplating different results. For example, if it were for transporting lumber from freight cars to lumberyard, instructions relating to where and how to pile it in transit might well concern means and manner.

It is said that the "informality and indefiniteness of the agreement is some evidence of an employer-employe relationship." But the contract was sufficiently definite in important respects. At all times the reference was to a certain log pile on the Millam farm estimated to contain 40,000 board feet of lumber, and Anfinson was to receive five dollars per 1,000 feet converted therefrom. Sawing logs was Anfinson's principal occupation, and he owned a mill which he dismantled and moved to the logs when, as here, the job was large enough to warrant it. Each of these terms and factors is important though not controlling. Together they compel an implication that all of the logs were to be converted under the contract. Certainly, those terms of a contract which are necessarily implied are, for that reason alone, of no less dignity than the express. The lodge, too plainly for reasonable debate, lacked that "unfettered right of discharge or termination" from which could arise a control over manner and means of performance. *Cf.* Bolin v. Scheurer, 210 Minn. 15, 18, 297 N. W. 106, 107.

There is a total absence of evidence that Anfinson was told by the lodge when to work, where to work, how to work, or how much help to engage. There is nothing from which to infer that under the contract the lodge had a right of control, though unexercised, which extended beyond "result" to "manner and means" of performance. Thus, I cannot agree with the finding of the commis-

sion, affirmed by the majority of this court, that the letters "imply a right of control by the company [the lodge] over these wood sawing operations" sufficient to justify a conclusion that an employer-employe relationship existed.

LORING, JUSTICE (dissenting).

I concur in the views expressed by Mr. Justice Stone.