# MARLENE P. ELWELL v. GEORGE FAKE AND OTHERS. SCHANNO LIVESTOCK PULLMAN COMPANY AND ANOTHER, RELATORS.

119 N. W. (2d) 19.

December 21, 1962—No. 38,625.

*Firestone, Fink, Krawetz, Miley & O'Neill,* for relators.
*Grannis & Grannis,* for respondent Elwell.
*Robert Bakke,* for respondent Fake.

THOMAS GALLAGHER, JUSTICE.

Certiorari to review a decision of the Industrial Commission awarding compensation for the death of Bernard D. Elwell to his widow, Marlene P. Elwell, and his three dependent children against relator Schanno Livestock Pullman Company, a corporation, and respondent George Fake as coemployers.

On July 8, 1959, the decedent met death accidentally in the course of his employment while driving a tractor owned by Fake with trailer attached owned by the corporation on a return trip from Green Bay, Wisconsin, to South St. Paul. The sole issue for determination is whether at that time the corporation was a coemployer of decedent. The commission determined that the corporation and Fake were his coemployers, and the corporation and its insurer bring certiorari.

At the time of the accident, the tractor was leased exclusively to the corporation under a written lease for one year covering the period from December 31, 1958, to December 31, 1959. It provided:

"The lessor [Fake] will furnish for operation of the said vehicle or vehicles the required lubricants and fuel and will also furnish one or more competent drivers as may be the case.

"During the period of this lease the said vehicle or vehicles shall be solely and exclusively under the direction and control of the lessee who shall also be liable to the shipper or consignee for any loss, damage or unreasonable delay of the cargoes, for any property damage that may be caused by the operation of the said vehicle or vehicles by the lessee, and for any public liability resulting from the said operation by the lessee * * *.

\* \* \* \* \*

"In consideration of the foregoing, lessee agrees promptly to pay to the lessor and the lessor agrees to accept as hire of the said equipment and reimbursement for the services of any driver or drivers the following compensation." (No schedule of compensation followed.)

The corporation is a contract carrier engaged in the business of hauling livestock by trailers which it owns. It leases approximately 15 tractors from various tractor owners for the purpose of hauling such trailers.

The corporation and the tractor owners, including Fake, had agreed on a schedule of rates under which the tractor owners were paid the sum of $105 for hauling a load of cattle in the corporation's trailers from South St. Paul to Green Bay, Wisconsin, with return of the trailers to the corporation's terminal in South St. Paul. This sum covered the use of the tractor; the cost of oil, gas, insurance, and repairs; and $30 as wages of the driver for the round trip. As to such wages, the amount paid therefor was fixed by the corporation which on occasion advanced them from its funds and thereafter deducted sums thus paid from amounts due various tractor owners. When payment was made in this manner, social security and withholding taxes were not deducted, although in Fake's case the corporation computed the same and advised him as to the amount due therefor.

The corporation purchased uniforms for the various tractor drivers,

including decedent, paying one-half of the cost thereof, the remainder being paid by the drivers. Its insignia was placed on all tractors, including the one involved in the fatal accident. Its callboard carried the names of the various drivers, and calls for drivers were often made directly to the drivers by corporation officials without notice to the tractor owners. For the fatal trip it had called decedent in this manner, and until after the accident, Fake was unaware that decedent was working. The corporation designated the routes the drivers were to follow on the various trips and directed them as to gasoline stations to be patronized in refueling the tractors. It carried a group policy of hospitalization and life insurance covering all drivers including decedent under an arrangement whereby it paid part of the premiums. Both the application for this policy, executed by the corporation, and the policy itself, listed decedent as an employee of the corporation.

Fake testified that he resided on a small farm near Delano; that commencing in 1957 he had hauled livestock for the corporation in its trailers using his Studebaker tractor for such purpose; that in August 1958 he had purchased a new 190 International tractor which he immediately leased exclusively to the corporation and which, since that time, had been used only by the corporation; that at all times when this tractor was not in use for the corporation it was left at the corporation's terminal at South St. Paul; that since its purchase it had been driven by various drivers in hauling the corporation's trailers, principally by one George Eckblad, and that on a few occasions he (Fake) had driven it in hauling the corporation's trailers; that he had nothing to do with obtaining drivers for it; that he had not been instrumental in employing decedent to operate it; that he had known decedent only from "being up at Schanno's"; that the first he knew that decedent was driving it for the corporation was following a trip made with it about July 3, 1959, when he had received a check from the corporation upon which decedent's name had been written; that Paul Schanno, president of the corporation, had "told Elwell, I imagine, * * * to take the truck and go ahead"; that when his tractor had been used, Schanno always had told him that a man there, working for the organization, would drive it; that with respect to payments of the drivers' wages, they came out of the "truck earnings"; that he had

not carried workmen's compensation insurance on the drivers; that a binder had been issued to him for such insurance but that he had never paid the premium on it; that he had never hired decedent nor instructed the corporation that he might drive his (Fake's) tractor or requested that the corporation use him to drive such tractor; that he was completely unaware that decedent had been driving it on the fatal trip; that as far as he presently knew decedent had driven his tractor on but four prior occasions; that he had not seen nor talked to decedent since April or May of 1959; and that as to any of his conversations with Paul Schanno they had not related to employing decedent.

Paul Schanno, president of the corporation, testified that he had known decedent about 5 years during which time decedent had driven various tractors hauling livestock in the corporation's trailers; that he had furnished decedent with a uniform on which the corporation's insignia including its name had been sewed and for which the corporation had paid one-half of the cost; that the corporation's name was painted on both sides of the tractors, including Fake's; that it was the duty of the drivers to look at the callboard in the corporation's office for information as to prospective trips; that the corporation's records with respect to Fake's tractor disclosed that decedent had only driven it on a few trips during the week before the accident; that before this, on about June 8, 1959, decedent had quit hauling the corporation's trailers but that thereafter he had resumed such work the latter part of June 1959; that when decedent had returned to work Fake's tractor had been disabled in an accident and was being repaired; that decedent first drove it on June 29, 1959; that on July 6, 1959, decedent had driven a tractor and trailer belonging to Schanno on a trip for the corporation from which he had returned to South St. Paul on the morning of July 7, 1959, for which he was paid by the corporation; that at 9 p. m. that day he had left for Green Bay with a load of livestock in the corporation's trailer and using Fake's tractor; that it was on the return trip that the fatal accident occurred; that on one occasion prior to the time decedent had resumed hauling the trailers he (Schanno) had talked to Fake and the latter had told him that decedent wished to drive Fake's tractor but that he did not know whether Fake had ever asked decedent to drive such tractor; and that with respect to decedent's

instructions as to the final trip these had come from corporation officials. He testified further that ordinarily he could stop a driver from "pulling my trailer" regardless of who had employed him; that if drivers did not know how to handle the livestock or drive the tractors he "wouldn't have them around"; and that in one instance after he had discovered that a driver was drinking he had told the tractor owner that if the driver "didn't want to straighten up, to bounce him."

He also testified that on occasions when repair work was necessary on Fake's tractor he would order such repairs made without consulting Fake and would deduct the cost thereof from amounts due the latter; and that the corporation carried workmen's compensation insurance on its employees which covered the driver of the tractor that he owned and leased to the corporation, which tractor decedent had been driving the day prior to the fatal accident.

The record further discloses that the duties of the drivers were not limited to those described in the leases, but included requirements having reference to the servicing of the equipment; the handling of the livestock, including the providing of bedding for it in the corporation's trailers; and the supervision of its loading and unloading; that they were held responsible to the corporation for losses or death of livestock en route due to their negligence, and that Schanno reserved the right to determine if any such losses were due to the negligence of the drivers; and that the corporation assumed liability for the negligence of drivers en route and while any tractor and trailer were coupled and in use together. The record further established that Fake was absent from the corporation's premises for substantial periods, and that he was seldom aware of the specific trips undertaken with his tractor, or of the names of the drivers directed by the corporation to drive it.

Lawrence Tracy, a driver, testified that he had been engaged at times prior to the accident in hauling trailers for the corporation and that on a number of occasions in response to calls from Paul Schanno and without the knowledge of Fake or instructions from him had driven Fake's tractor on trips for the corporation for which he had been paid by it and not by Fake.

In its decision the Industrial Commission determined that Fake and

the corporation were decedent's coemployers at the time of his death. Therein it set forth the following:

"\* \* \* our Supreme Court has summarized the law in \* \* \* Turner vs. Schumacher Motor Express, et al, 230 Minn. 172; 41 N. W. (2d) 182; \* \* \* and Gibson vs. Moore Motor Freight Lines, Inc., et al, 246 Minn. 359; 75 N. W. (2d) 212; \* \* \*. Those cases point out that the question is one of fact. \* \* \*

"We believe that the elements of contract and employment in the instant case are not the same as in the Turner and Gibson cases. We believe both Fake, and Schanno, as an officer of Schanno Livestock Pullman Company, had the right to and did exercise considerable control. \* \* \* Fake was busy with his other interests and desired to keep his trucks busy and yet not to have to devote the time to detailed supervision of Elwell. This was accomplished by Schanno assuming employership over Elwell, and all of this was with Fake's acquiescence. Schanno arranged all of the time of travel for Elwell. \* \* \* He paid for part of the uniforms on which was advertised his (Schanno's) business name. He took out a group policy on the theory of his being the employer of Elwell and the other drivers. He assumed a certain amount of responsibility for the payment of Elwell's wages, although he did charge the payment back to Fake."[1]

1. Ordinarily whether an employer-employee relationship exists between two parties is a question of fact. Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182; Darvell v. Paul A. Laurence Co. 239 Minn. 55, 57 N. W. (2d) 831; Ledoux v. Joncas, 163 Minn. 498, 204 N. W. 635; 21 Dunnell, Dig. (3 ed.) § 10395. Although here a written agreement in part defined the relationship between the corporation and decedent this would not foreclose a finding that under the Workmen's Compensation Act decedent was the employee of the corporation. Washel v. Tankar Gas, Inc. 211 Minn. 403, 2 N. W. (2d) 43; Nesseth v. Skelly Oil Co. 176 Minn. 373, 223

---

[1]George Fake did not appeal from this decision, and we do not pass upon the issue of joint employment referred to by the commission.

N. W. 608; Angell v. White Eagle Oil & Refining Co. 169 Minn. 183, 210 N. W. 1004.

2. The evidence amply sustains the commission's finding that at the time of the accident decedent was the employee of the corporation. It discloses a working arrangement between the tractor owner and the corporation as owner of the trailer, under which detailed authoritative control of decedent in the performance of his work was transferred from the tractor owner to the corporation, which professed the right to terminate the services of *any* driver hauling the *corporation's trailers,* or *any* driver who did not "know how to handle livestock or how to drive a truck." It indicates further that arrangements for driving various tractors were made with decedent by the corporation at the corporation's terminal; that just prior to the accident decedent had driven another tractor for the corporation for which the latter had paid his wages; and that neither before nor subsequent to his resumption of work in hauling the trailers in June 1959 had there been any conversation between decedent and Fake with reference to the former's employment. In this situation, it can scarcely be doubted that while decedent was en route for the corporation the latter could exercise that detailed authoritative control over him which we have often held requisite to the employer-employee relationship, Nepstad v. Lambert, 235 Minn. 1, 50 N. W. (2d) 614; Krause v. Bodin, 172 Minn. 467, 215 N. W. 838; Rouse v. Town of Bird Island, 169 Minn. 367, 211 N. W. 327; Herron v. Coolsaet Bros. 158 Minn. 522, 198 N. W. 134; and the fact that decedent may have at times received wages from Fake would not be decisive of the issue, in view of the other facts and circumstances described. Bolin v. Scheurer, 210 Minn. 15, 297 N. W. 106; Byhardt v. Ballord, 209 Minn. 391, 296 N. W. 504.

3. It is also clear that both the corporation and decedent recognized the employer-employee relationship existing between them. In its application for a group policy of hospitalization and life insurance, the corporation listed decedent as one of its employees. It provided him with a uniform upon which its name had been printed and for which it had paid a portion of the cost. He accepted it and wore it while working. The corporation fixed the amount he was to be paid for various trips. It carried his name as a driver on its callboard and he

responded to various calls from its officials without consulting the tractor owners. Not until his arrival at the corporation's terminal was he informed as to the identity of the tractor he would be required to operate. Instructions relative to his duties came directly from the corporation. His acquiescence in all such arrangements would clearly establish his consent to the corporation as his employer. See, Pocrnich v. Snyder Min. Co. 233 Minn. 81, 45 N. W. (2d) 794; Yoselowitz v. Peoples Bakery, Inc. 201 Minn. 600, 277 N. W. 221.

4. Under the Workmen's Compensation Act, it has often been held that similar evidence is sufficient to sustain a finding that an employer-employee relationship existed as between a hirer of automotive or like equipment and its owner or a workman furnished by such owner employed to operate the hired equipment. Darvell v. Paul A. Laurence Co. *supra*; Nesseth v. Skelly Oil Co. *supra*; Schonberg v. Zinsmaster Baking Co. 173 Minn. 414, 217 N. W. 491; Krause v. Bodin, *supra;* Angell v. White Eagle Oil & Refining Co. *supra;* Anfinson v. A. O. U. W. Ins. Co. 212 Minn. 183, 3 N. W. (2d) 7; Bolin v. Scheurer, 210 Minn. 15, 297 N. W. 106.

5. The situation here is quite distinct from those presented in Turner v. Schumacher Motor Express, Inc. 230 Minn. 172, 41 N. W. (2d) 182, and Gibson v. Moore Motor Freight Lines, Inc. 246 Minn. 359, 75 N. W. (2d) 212, where we sustained findings that the right to exercise detailed authoritative control of drivers furnished to operate leased automotive equipment had not passed to respective lessees thereof. There the owner of the equipment was engaged in hauling merchandise for others under individual lease agreements, each of which covered a specific trip, and regularly employed drivers to operate the numerous trucks, tractors, and trailers therein and retained and exercised the right to control them in such work. There the lessees did not own the trailers or any other part of the equipment. There the owner of the equipment gave all instructions to drivers as to their duties on specific trips, and empowered them to solicit orders from different carriers for the carriage of freight on the return trips to the Twin Cities and to execute individual leases with such carriers for this purpose. Only the owner possessed the right to discharge the drivers at any time; or to substitute other drivers for them en route. The owner agreed to

hold the respective lessees harmless from liability for any negligent acts of the drivers. When the leased equipment was not in use, it was maintained at the owner's terminals·in the Twin Cities. Certainly, there is no similarity between the facts in the cited cases and those involved here.

Respondent is allowed $250 attorneys' fees.

Affirmed.